ACCEPTED
12-14-00158-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
3/26/2015 12:35:15 PM
CATHY LUSK
CLERK

APPELLANT RESPECTFULLY REQUESTS ORAL ARGUMENT

_____

12-14-00158-CR

_____

IN THE
COURT OF APPEALS
FOR THE TWELFTH DISTRICT
TYLER, TEXAS

_____

RICKY NEAL, JR., Appellant

VS.

THE STATE OF TEXAS, Appellee

_____

RECEIVED IN
12th COURT OF APPEALS
TYLER, TEXAS

3/26/2015 12:35:15 PM

CATHY S. LUSK
Clerk

FILED

3/26/2015

Twelfth Court of Appeals
Cathy Lusk
Clerk

On Appeal from the 7th District Court of Smith County, Texas
Trial Court Cause No. 007-0505-13
Before the Honorable Kerry L. Russell

_____

APPELLANT'S BRIEF

_____

CARLO D'ANGELO, PC
ATTORNEY AT LAW
100 East Ferguson, Suite 1210
Tyler, Texas 75702
Tel 903.595.6776
Fax 903.407.4119
carlo@dangelolegal.com
Attorney for Appellant

## Identity of Parties and Counsel

**Parties to the Appeal:**

Ricky Neal, Jr., Appellant

The State of Texas

**Names and Addresses of Trial Counsel:**

Jeffrey Allen Wood and Brian Mitchell Jiral
Assistant District Attorney
Smith County District Attorney
100 N. Broadway Avenue
Tyler, Texas 75702
(903) 535-0520

Thad Watts Davidson
Davidson Law Office
329 South Fannin Avenue
Tyler, Texas 75702
(903) 595.9600

**Names and Addresses of Appellate Counsel:**

Michael West
Assistant District Attorney
Smith County District Attorney
100 N. Broadway Avenue, 4th Floor
Tyler, Texas 75702

Carlo D'Angelo
100 E. Ferguson, Suite 1210
Tyler, Texas 75702

## Request for Oral Argument

In accordance with Rule 39.1 of the Texas Rules of Appellate Procedure, Appellant respectfully requests oral argument. Appellant submits that if granted, oral argument in this cause will further clarify the issues raised in this brief and aid this Honorable Court in assessing the merits of the arguments raised therein.

## Table of Contents

Identity of Parties and Counsel ....................................................................... ii

Request for Oral Argument ............................................................................... ii

Table of Contents ............................................................................................. ii

Index of Authorities ........................................................................................ iv

Statement of the Case ..................................................................................... vii

Issues Presented............................................................................................. viii

References to the Record................................................................................... 1

Background ....................................................................................................... 2

Statement of Facts.......................................................................................... 3-4

Summary of Arguments.................................................................................... 4

Argument .......................................................................................................... 5

Issue One: The State failed to prove that Appellant did not fire upon and kill Mass in self-defense……………………………………………………………...5

Issue Two: The trial court erred in limiting Appellant's ability to elicit testimony establishing the alleged victim, Moss', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case……………......20

Issue Three: The trial court erred in limiting Appellant's ability to elicit testimony establishing the alleged victim, Moss', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case……………….27

Issue Four: The trial court erred in limiting Appellant's cross-examination of State's witnesses to establish the alleged victim, Moss', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case.……...30

Issue Five: The trial court erred in denying Appellant's request for a necessity instruction. …………………………………………………………….…41

Issue Six:. The trial court erred in its ruling that Appellant could not elicit testimony from defense witness, Wilmon Davis, that shortly prior to the shooting someone in the mall utter "he might get shot."………………………….…46

Issue Seven: Trial counsel rendered ineffective assistance of counsel in failing to challenge whether the State's gang identification witness was qualified to render an expert opinion that Appellant was affiliated with a gang. …………………….…58

Issue Eight: The trial court erred in denying Appellant's request lesser-included offense jury instructions. ……………………..…………………………...76

Issue Nine: The trial court erred in denying Appellant's request for inclusion in the punishment charge of a sudden passion instruction………………………...81

Prayer…………………………………………………………………….…..88

Certificate of Compliance …………………………………………………..…88

## Index of Authorities

### Cases

*Abdnor v. State,* 871 S.W.2d 726, 731 (Tex.Crim.App.1994)…………………………75

*Airline v. State*, 721 S. W. 2d 348, 351 (Tex. Crim. App. 1986) …………………….40

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)………………….53

*Andrews v. State, 159 S.W.3d 98* (Tex.Crim.App.2005).................................................61

*Anderson v. State*, 15 S.W. 3d 177, 184 (Tex. App.—Texarkana 2000) ……………57

*Alonzo v. State*, 353 S.W. 3d 778, 781 (Tex. Crim. App. 2011) …………………..77

*Barrios v. State*, 389 S.W.3d 382 (Tex. App.—Texarkana 2012)...............................34

*Benavides v. State*, 992 S.W.2d 511, 524–25 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd)……………………………………………………………………………....87

*Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999)..................................55

*Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App.2010).......................................6

*Bumgardner v. State*, 963 S.W.2d 171, 175 (Tex. App. 1998)....................................52

*Butler v. State*, 663 S.W.2d 492, 496 (Tex. App. 1983)..............................................52

*Carmen v. State*, 276 S.W.3d 538, 545 (Tex. App. 2008).............................................44

*Chew v. State*, 804 S.W.2d 633, 635 (Tex.App.-San Antonio 1991)..........................29

*Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007)......................................6

*Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App.2000)...........................................6

*Davis v. State*, 278 S.W.3d 346, 352 (Tex.Crim.App.2009).......................................50

*Darkins v. State*, 430 S.W.3d 559, 565 (Tex.App.-Houston[14th Dist.] 2014)............8

*DeLeon v. State*, 322 S.W.3d 375 (Tex. App. 2010.....................................................75

*Dempsey v. State*, 159 Tex. Crim. 602, 266 S.W.2d 875, 877–78 (Tex. Crim. App. 1954).............................................................................................................................23

*Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) ................................50

*Diaz v. State*, 380 S.W.3d 309, 311 (Tex.App.Fort Worth 2012, pet. ref'd)............57

*Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587 (1993*)...................................60

*Ferrel v.State, 55 S.W.3d 586, 591 (Tex.Crim.App.2001)*...............................................33

*Fry v. State,* 915 S.W.2d 554, 560–61 (Tex.App.-Houston[14th Dist.] 1995, no pet.)..........................................................................................................23

*Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)..................................61

*Gaspar,* 327 S.W.3d 349, 356 (Tex. App.—Texarkana 2010)..............................43

*Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998)...........63

*Green v State, 876 S.W.2d.226* (Tex.App.—Beaumont 1994, no pet.).....................56

*Guilbeau v. State,* 193 S.W.3d 156 160 (Tex. App.—Houston (1st Dist.) 2006)......51

*Guzman v. State,* 188 S.W.3d 185, 188 (Tex.Crim.App.2006) ........................77

*Grffen v. State,* 2014 WL 7474076 (Tex. App.—Houston (1st Dist.) 2014) ...........87

*E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995).........61

*Forest v. State,* 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)). .....................79

*Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923)............................60

*Hamel v. State,* 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)..............................49

*Hall v. State,* 225 S.W.3d 524, 535 (Tex. Crim. App. 2007) ..........................77

*Hartsfield v. State,* 305 S.W.3d 859, 863 (Tex.App.-Texarkana 2010)......................6

*Hill v. State,* 99 S.W.3d 248, 251 (Tex. App.-Fort Worth 2003, pet. ref'd).............33

*Hooper v. State,* 214 S.W.3d 9, 13 (Tex.Crim.App.2007).........................................7

*Jackson v. State,* 877 S.W.2d 768 (Tex. Crim. App. 1994).....................................74

*Jackson v. State, 482 S.W.2d 864, 868 (Tex.Crim.App 1972)*......................................30

*Johnson v. State,* 650 S.W.2d 414, 416 (Tex. Crim. App. 1983)..............................50

*Johnson v. State,* 433 S.W.3d 546 (Tex. Crim. App. 2014)......................................30

*Jones v. State,* 944 S.W.2d 642, 647 (Tex. Crim. App.1996)....................................6

*Klein v. State,* 662 S.W.2d 166 (Tex.App.—Corpus Christi 1983, no pet.)..............43

*Koehler v. State,* 679 S.W.2d 6, 9 (Tex. Crim. App.1984).........................................29

*Lavern v. State,*48 S.W.3d 356, 360–61 (Tex. App.-Houston[14 Dist.] 2001)...........51

*Lopez v. State,* 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)...................................69

*Love v. State,* 199 S.W.3d 447, 455 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd)
…………………………………………………………………………………….82

*Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Crim.App.1975) ………………..……..81

*Matchett v. State,* 941 S.W.2d 922, 940 (Tex.Crim.App.1996)..................................28

*Matthews v. State,* 708 S.W.2d 835, 837–38 (Tex. Crim. App. 1986) .......................36

*McDonald v. State,* 179 S.W.3d 571, 576 (Tex. Crim. App. 2005)............................20

*McKinney v. State,* No. 12–03–00155–CR, 2004 WL 1852975, 2004 Tex. App.
LEXIS 7472 (Tex. App.-Tyler August 18, 2004) ……………………………….87

*Medina v. State,* 411 S.W.3d 15, 21(Tex. App.-Houston [14th
Dist.]2013)....................................................................................................................45

*Miranda v. State,* 350 S.W.3d 141, 147 (Tex. App.-San Antonio 2011, no
pet.)..................................................................................................................................7

*Morales v. State,* 357 S.W.3d 1, 7 (Tex.Crim.App.2011)..............................................9

*Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 712 (Tex. 1997)……………64

*Mozon v. State,* 991 S.W.2d 841, 845 (Tex. Crim. App. 1999)..................................23

*Ngo v. State,* 175 S.W.3d 738, 744 (Tex. Crim. App. 2005).......................................31

*Ortiz v. State,* 144 S.W.3d 225, 233–34 (Tex. App.–Houston [14th Dist.] 2004, pet. ref'd) …………………………………………………………………………78

*Pentycuff v. State,* 680 S.W.2d 527 (Tex.App.—Waco 1984, pet. ref'd)....................50

*Pitonyak v. State,* 253 S.W.3d 834, 846 (Tex. App.-Austin 2008, pet. ref'd) ……….80

*Rylander v. State,* 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)................................68

*Saxton v. State,* 804 S.W.2d 910, 914 (Tex. Crim App. 1991)....................................6

*Semaire v. State,* 612 S.W.2d 528, 530 (Tex. Crim. App. 1980)................................44

*Strickland v. Washington,* 466 U.S. 668, 686 (1984)………………………….………..57

*Shaw v. State,* 243 S.W.3d 647, 657 (Tex.Crim.App.2007).......................................34

*Smith v. State,* 355 S.W.3d 138, 145 (Tex.App.-Houston [1st Dist.] 2011)................7

*Smith v. State,* 874 S.W.2d 269, 273 (Tex.App.—Houston[14th Dist.] 1994)....................................................................................................................50

*Tate v. State,* 981 S.W.2d 189, 192–93 & n. 5 (Tex.Crim.App.1998).......................24

*Thompson v State,* 9 S.W.3d 808, 814(Tex.Crim.App.1999).....................................68

*Torres v. State,* 71 S.W.3d 758, 760 & n. 4 (Tex. Crim. App. 2002)..........................23

*Torres v. State,* 117 S.W.3d 891, 896–97 (Tex. Crim. App. 2003).............................25

*Trevino v. State,* 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). …………………….84

*Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006)....................................73

*Virts v. State,* 739 S.W.2d 25  (Tex. Crim. App. 1987)..............................................29

*Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)............................54

*Wilson v. State,* 391 S.W.3d 131 (Tex.App.–Texarkana 2012, no pet.)..............................................................................................................49

*Wiggins v. Smith,* 539 U.S. 510 (2003)………………………………………………69

*See Wooten v. State,* 400 S.W.3d 601, 608–09 (Tex. Crim. App. 2013)………….83

*Yantis v. State,* 49 Tex. Crim. 400, 94 S.W. 1019, 1021

(Tex.Crim.App.1906)....................................................................................24

*Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App.2003).....................................7

**Rules**

Tex. R. App. P. 9.4...................................................................................... 88

Tex. R. Evid. 803(1)………………………………………………………….55

Tex. R. Evid. 702 …………………………………………………....…60

Tex R. Evid. 705(c)………………………………………………………….73

**Codes**

Tex. Pen. Code Ann. § 9.22(1)……………………………………………….50

Tex. Code Crim. Proc. Ann. art. 36.19 ………………………………….…53

Tex. Pen. Code § 2.03(a)…………………………………………………76

TEX. PEN. CODE § 9.02 …………………………………………………....76

TEX. PEN. CODE § 2.03(d)…………………………………………………..76

TEX. PEN. CODE § 9.31 …………………………………..……………76

TEX. PEN. CODE ANN. § 22.05(a) ………………………………………….77

Tex. Code Crim. Proc. Ann. art. 37.09(3) ……………………………………80

Tex. Penal Code Ann. § 6.03(c) ……………………………………………81

## Secondary Sources

Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 6:22 (15th ed. 1998 & Supp. 2000)..............................................................................49

Judge Harvey Brown *Eight Gates for Expert Witnesses*, 36 Hous. L. Rev. 743, 744 (1999) ................................................................................................................64

David E. Colmenero, A Dose of Daubert to Alleviate "Junk Science" in Texas Courtrooms: Texas Adopts the Federal Standard for Determining the Admissibility of Scientific Expert Testimony, *27 Tex. Tech L. Rev. 293, 294 (1996*)…………….61

Jason G. Duncan, Note, *"A Pig's Breakfast": Judicial Gatekeeping for Scientific and Specialized Expert Testimony*, 6 Suffolk J. Trial & App. Advoc. 21, 30 (2001).............62

Edward J. Imwinkelried, *The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L. Rev. 2271, 2279 (1994).......................................................................60

Placido G. Gomez, *It is Not So Simply Because an Expert Says It's So: The Reliability of Gang Expert Testimony Regarding Membership in Criminal Street Gangs: Pushing the Limits of Texas Rule of Evidence*, 702, 34 St. Mary's L.J. 581, 605 (2003)..............................64

Emily L. Baggett, Note, *The Standards Applied to the Admission of Soft Science Experts in State Courts*, 26 Am. J. Trial Advoc. 149, 156 (2002) ………………………………..62

## Statement of the Case

Offense:                                                                  (CR 1)

Appellant's plea to offense:                          (CR 19) and (RR 13/244)

Trial on Guilt/Innocence:                                                   Yes

Finding on Guilt: Yes                              (RR 18/11) (CR 385)

Trial on Punishment:                                                        Yes

Punishment:                          Life (RR Supp. Vol. 1/38) (CR 401)

Judgment:        Judgment conforms to the verdict (RR Supp. Vol. 1/38) (CR 416)

## Issues Presented

### Issue One

The State failed to prove that Appellant fired upon and killed Mass in self-defense.

## Issue Two

The trial court erred in limiting Appellant's ability to elicit testimony establishing the alleged victim, Mass', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case.

## Issue Three

The trial court erred in limiting Appellant's cross-examination of State's witnesses to establish the alleged victim, Mass', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case.

## Issue Four

The trial court erred in granting the State's proposed jury instructions negating Appellant's claim of self-defense.

## Issue Five

The trial court erred in denying Appellant's request for a necessity instruction.

## Issue Six

The trial court erred in its ruling that Appellant could not elicit testimony from defense witness, Wilmon Davis, that shortly prior to the shooting someone in the mall utter "he might get shot."

## Issue Seven

Trial counsel rendered ineffective assistance of counsel in failing to challenge whether the State's gang identification witness was qualified to render an expert opinion that Appellant was affiliated with a gang.

## Issue Eight

The trial court erred in denying Appellant's request lesser-included offense jury instructions.

## Issue Nine

The trial court erred in denying Appellant's request for inclusion in the punishment charge of a sudden passion instruction.

_____

12-14-00158-CR
_____

IN THE
COURT OF APPEALS
FOR THE TWELFTH DISTRICT
TYLER, TEXAS
_____

RICKY NEAL, JR., Appellant

VS.

THE STATE OF TEXAS, Appellee
_____

TO THE HONORABLE COURT OF APPEALS:

Appellant, RICKY NEAL, JR., respectfully submits this brief in the above styled and numbered cause. This is an appeal of a conviction for the offense of Murder in the 7th District Court of Smith County, Texas, before the Honorable Kerry Russell.

**References to the Record**

References to the Clerk's Record are designated as "(CR page number)" References to the Reporter's Record are designated as "(RR volume number (1-24) / page number)"

1

## Background

In the Indictment, the State alleged that on or about the 9th day of February 2013, in Smith County, Texas, Appellant did intentionally or knowingly cause the death of an individual names Christopher Mass, by shooting Christopher Mass with a firearm (CR 1). *See* Article 19.02(b)(1), TEX. PEN. CODE. The Indictment further alleged that Appellant also did then and there, with the intent to cause serious bodily injury to an individual, namely, Christopher Mass, commit an act clearly dangerous to human life that caused the death of Mass, by shooting him with a firearm. *Id.* Finally, the Indictment charged that Appellant used or exhibited a deadly weapon, a firearm, during the commission of the above offense. *Id.* This offense is a first-degree felony and is punishable by imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years in the Texas Department of Criminal Justice and a fine not to exceed $10,000.00. *See* TEX. PEN. CODE § 12.32.

Appellant plead not guilty (CR 19) and (RR 13/244). After hearing the evidence, the jury nevertheless found Appellant guilty (RR 18/11). The jury later returned a punishment verdict of confinement in the Texas Department of Criminal Justice, Institutional Division for life (RR 22/166). Based upon the jury's verdict, the trial court thereafter sentenced Appellant to life term of confinement in the Texas Department of Criminal Justice, Institutional Division (RR 23/9).

2

## Statement of Facts

On February 9, 2013, Appellant called 911 and reported that shot Christopher Mass in the parking lot of the Broadway Square Mall in Tyler, Texas (RR 16/275) and (State's Exhibit 63). After his arrest, Mr. Neal provided Tyler Police with a recorded statement admitting that he shot Mass, but that he did so in self-defense (RR 16/243). Appellant told officers that went to the mall that morning because it was the release date for a new Air Jordan show (State's Exhibit 63). Upon entering the mall, Appellant walked over the Chick-Fil-A restaurant to talk with an acquaintance, Jimmy Whitt. He then became involved in a verbal dispute with a subject he knew only as Dews ("Jonathan Dews"). *Id.*

Apparently back when Dews was in prison, Appellant had a conversation with his wife about whether she would stay married to him after his release (RR 14/36). Although Appellant tried to deescalate the situation, Dews insisted he wanted to fight him (RR 16/243). Appellant told police that as he exited the mall, he noticed who he later would learn was Mass standing in front of Champs sporting goods (RR 16/243). As Appellant continued out the door he stopped to speak to the manager of Champs, Kenesha Mayfield, and told her that there were some guys "trippin" and that he was going outside to send his girlfriend, Tamara Norris, who was waiting outside in the car in to pay for the shoes. *Id.*

3

As Neal approached his girlfriend's vehicle he told her that some guys were in the mall "trippin" and asked her to go in and pay for the shoes (RR 15/89 and 92). Appellant then walked from the driver's side of the vehicle to the back right door and check on his belongings in the backseat. *Id.* As he did so, Appellant noticed that Mass standing near an adjacent green Buick vehicle that was parked right next to his girlfriend's blue Ford Fiesta vehicle. *Id.* Appellant also noticed that Dews was standing close to him. *Id.*

Appellant then saw Mass open the door of the green Buick and put is sweatshirt in it (RR 15/59). Appellant believed that Mass reached into the vehicle to retrieve a weapon and so he retrieved his .40 caliber semi-automatic pistol from inside a black bag in the Fiesta (RR 16/235). Mass then began to walk toward the rear of the Buick and Appellant overheard Dews state that he was a "gangster" (State's Exhibit 63). Appellant believed at that moment that his life was in danger and he shot and killed Mass in self-defense and fired a shot in the direction of Dews. *Id.*

## Summary of Arguments

In his first issue, Appellant contends the State failed to prove that Appellant did not fire upon and kill Mass in self-defense. In his second issue, Appellant maintains the trial court erred in limiting Appellant's ability to elicit testimony

4

establishing the alleged victim, Moss', gang affiliation and how that evidence demonstrated his justified use of deadly force in this case.

Appellant maintains in his third issue that the trial court erred in limiting Appellant's cross-examination of State's witnesses to establish the alleged victim, Moss', gang affiliation and how that evidence demonstrated his justified use of deadly force in this case.

In his fourth claim, Appellant argues that the trial court erred in granting the State's proposed jury instructions negating Appellant's claim of self-defense. Appellant submits in his fifth claim that the trial court erred in denying Appellant's request for a necessity instruction.

In his sixth claim, Appellant maintains that the trial court erred in its ruling that Appellant could not elicit testimony from defense witness, Wilmon Davis, that shortly prior to the shooting someone in the mall utter "he might get shot." In his seventh claim, Appellant argues that trial counsel rendered ineffective assistance of counsel in failing to challenge whether the State's gang identification witness was qualified to render an expert opinion that Appellant was affiliated with a gang. In his final claim, Appellant argues [Possible Punishment Charge Error] TBD.

### Issue Number 1

The State failed to prove that Appellant fired upon and killed Mass in self-defense.

5

## Standard of Review-Sufficiency of Evidence

When reviewing a sufficiency challenge on the issue of self-defense, this Court views the evidence in the light most favorable to the verdict to see if any rational trier of fact could have found (1) the essential elements of murder beyond a reasonable doubt, and (2) against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton v. State,* 804 S.W.2d 910, 914 (Tex. Crim App. 1991).

The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony. *Jones v. State,* 944 S.W.2d 642, 647 (Tex. Crim. App.1996). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Id.* The Court resolves any inconsistencies in the testimony in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

## Argument

Appellant challenges both the sufficiency of the evidence to support the essential elements of the charged offense—murder and whether a rational fact finder could have found beyond a reasonable doubt against him on the self-defense issue.

In evaluating sufficiency of the evidence under the *Jackson* standard, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of murder beyond a reasonable doubt. *Brooks v. State,* 323 S.W.3d 893, 912

6

(Tex.Crim.App.2010) (referring to *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex.App.-Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007). Because the State carries the burden of persuasion to disprove self-defense beyond a reasonable doubt, we review a challenge to the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense under the *Jackson* standard. *See Brooks*, 323 S.W.3d at 912; *Smith v. State*, 355 S.W.3d 138, 145 (Tex.App.-Houston [1st Dist.] 2011, pet. ref'd); *see also Miranda v. State*, 350 S.W.3d 141, 147 (Tex.App.-San Antonio 2011, no pet.).[3] We examine legal sufficiency under the direction of the *Brooks* opinion while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App.2007) (citing *Jackson*, 443 U.S. at 318–19); *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

A person is justified in using deadly force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." Tex. Penal Code Ann. § 9.32(a)(2)(A) (West 2011). "Deadly force" is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

7

Where, as here, there is a claim of self-defense that is rejected by the jury, this Court must consider all the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational fact-finder could have found beyond a reasonable doubt (1) the essential elements of the offense and (2) against the appellant on the self-defense issue. *Darkins v. State,* 430 S.W.3d 559, 565 (Tex. App.-Houston [14th Dist.] 2014, pet. ref 'd) (citing *Saxton,* 804 S.W.2d at 913). Because self-defense is an issue of fact to be determined by the jury, the jury is free to accept or reject the defensive issue. *Medina v. State,* 411 S.W.3d 15, 21 (Tex. App.-Houston [14th Dist.] 2013, no pet.) (citing *Saxton,* 804 S.W.2d at 913–14). A jury's guilty verdict is an implicit rejection of the appellant's self-defense claim. *Saxton,* 804 S.W.2d at 914.

## A. Legal Sufficiency—Murder

A person commits murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1), (b)(2) (West 2011). However, under certain circumstances, self-defense justifies the use of deadly force. *Morales v. State,* 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). As relevant here, a person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31 of the penal code, and (2) when and to the degree he reasonably

8

believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. Tex. Penal Code Ann. § 9.32(a)(1) and (a)(2)(A) (West 2011). As relevant to this case, section 9.31 of the penal code justifies force "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2011).

Appellant had no motive or state of mind to attack and kill Mass based on the evidence presented to the jury. Although he did possess and used a firearm capable of causing Mass' injuries and Appellant in fact shot Mass 3 times, he had no intent to cause the death or serious bodily injury. At the time he fired the shots, Appellant stated to police that he had no intention of killing Mass (RR 16/241) (Appellant shot Mass 3 times). Appellant maintained in is voluntary statement that the reason he shot Mass was because he feared for his life. *Id.*

## B. Legal Sufficiency of Evidence of Self Defense

The initial burden to produce evidence supporting self-defense rests with the defendant. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App.2003); *Saxton v. State,* 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces some evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Zuliani,* 97 S.W.3d at 594; *Saxton,* 804 S.W.2d at 913–14. This burden of persuasion does not require that the State to produce evidence, but it does require

that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913. The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject any defensive evidence on the issue. *Saxton*, 804 S.W.2d at 913–14. If the jury finds the defendant guilty, then it implicitly finds against the defensive theory. *Id.* at 914.

In reviewing the legal sufficiency of the evidence to support the fact finder's rejection of a defensive issue, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Id.* at 914; *see also Kirk*, 421 S.W.3d at 777. The evidence the jury heard in this case was factually insufficient evidence to reject Appellant's self-defense claim. The jury heard evidence that at the time Appellant shot Mass, he feared for his life. *See, e.g., Saxton*, 804 S.W.2d at 914.

C.  **Relevant Evidence from the Trial**

Jonathan Dews testified that he went to the mall on the day of the shooting to buy new shoes (RR 14/21). He went to the mall early in the morning, before store hours, to make sure he would have a place in line to purchase Nike Air Jordan's before they sold out (RR 14/22). Shortly after he arrived at the mall,

10

Dews ran into two acquaintances, Jimmy Whitt and Christopher Mass (RR 14/27). After walking around the mall to the various shoe stores, Dews sat at the Chick-Fil-A and waited for the stores to open (RR 14/23). Eventually, Whitt joined Dews at the Chick-Fil-A (RR 14/34).

Whitt testified that he saw Appellant enter the mall while he as waiting at the Chick-Fil-A (RR 14/234). Whitt observed that Appellant was dressed up and Appellant told him he had to attend a funeral later that day. *Id.* Appellant asked Whitt if he had any shoes in his size. *Id.* Whitt then testified that after he told Appellant that he didn't have any shoes in his size, Dews began to have heated words with Appellant. *Id.* According to Whitt, Appellant asked Dews if he wanted to come outside and box him and that his shoes were in his car (RR 12/236) (Appellant was wearing dress shoes with no traction). Whitt added that Appellant then walked toward the exit of the mall and as he was exiting he waived his hand at Dews to "come on." *Id.* Whitt testified that as Appellant exited, Mass walked over to Dews at the Chick-Fil-A and then the two of them started to walk outside. *Id.* Whitt then left his shoes with an acquaintance, Quintin Smith, and walked outside after them. *Id.* (Smith then followed Whitt outside).

Dews' testimony contradicts this version of events. He testified that he then looked up and saw Appellant standing over him (RR 14/35). Dews added that while he was locked up in TDCJ serving a prison sentence for a "delivery of drugs"

11

conviction, Appellant had been in communication with his wife. Upon his release from prison, Dews discovered a Twitter conversation between Appellant and his wife in which he asked her why she went back to him (RR 14/36). Dews responded to the message by telling Appellant to stay out of his business. *Id.* Appellant made no threats on Twitter that he wanted to fight or in anyway harm Dews (RR 14/112).

Two weeks prior to the shooting incident, Dews and his wife, Lashanda, ran into Appellant while he was working at the Champs store in the mall (RR 14/38). Lashanda told Dews that Appellant was the person that he'd told-off on Twitter (RR 14/39). Once again, Appellant made no threat during that encounter that he wanted to fight or harm Dews (RR 14/112).

Dews testified that as he was waiting at the Chick-Fil-A he looked up and saw Appellant standing over him. He then asked him "do we have a problem?" (RR 14/40). Whitt testified to the complete opposite (RR 15/18) (confirming Dews approached Ricky Neal). Appellant responded "You don't know me and I don't know you and we going to keep it that way." *Id.* Dews asked Appellant what he meant by that and then Dews stood up again asked "what you talking about?" *Id.* Dews claimed that Appellant answered saying "I'm going to show you about me. I'm going to go put on my shoes" and he then exited the mall. *Id.* Dews took this to mean that Appellant was going to put different shows so the two could fight (RR

12

14/42). Dews also claims that as he exited out the door of the mall, Appellant turned and waived for him to "come on." *Id.* This testimony was inconsistent with surveillance footage of Appellant's exit form the mall (RR 14/143) (Appellant's hand is obstructed on the footage).

According to Dews, Whitt tried to stop him, but Dews persisted in leaving the mall to go out and confront Appellant. *Id.* (RR 15/19) (Whitt testified he did not try to stop Dews). Mass then approached Dews to ask what was going on and the two men proceeded to exit the mall together to go and fight Appellant (RR 14/43). Dews was the first to exit the mall (RR 14/44). Whitt's testimony contradicts Dews. (RR 15/20) (Dews and Mass exited first and then about a minute later Whitt).

Quintin Smith testified that when he exited the mall he saw: Appellant at his car, Dews standing parallel to a car that was between Mass' and Appellant's car, and Mass taking his sweatshirt off and placing it in his car (RR 15/59). Smith next claimed he saw Appellant "come from the car and immediately cock his gun." *Id.* Smith alleges he heard Appellant say "I told y'all I was going to be ready" (RR 15/60). Smith saw Appellant shoot Mass and then turned the gun on Dews (RR 15/61). Smith then retreated back into the mall. *Id.* Smith testified he heard "two or three" gunshots (RR 15/63).

While in the JC Penney parking lot Dews observed Ricky Neal standing between two vehicles (RR 14/47). He claims that Appellant saw him and told him "to come one" and why didn't he come out by himself. *Id.* Dews claims that as he walked toward Appellant he could see him unbuttoning his shirt. *Id.* This act clearly demonstrates that Appellant was preparing for a potential fistfight with Dews and not a shoot-out.

As Dews approached Appellant, he observed Mass walking toward his (Mass') car (RR 14/48). He observed Mass take off his hoodie and threw it into his car (RR 14/51). At that point Dews claims that Appellant asked him "[a]re y'all trying to jump me?" (RR 14/50). Dews then took off his jacket as he continued to walk towards Appellant to fight. *Id.* This evidence clearly establishes that Appellant was confronted by multiple assailants while in the mall parking lot. Dews next claimed that Appellant looked at Mass standing by his car with his arms crossed and asked who he was. *Id.* (Whitt instead testified that Mass' arms were not crossed (RR 15/37). Dews claims Mass responded that he was looking out for his "homeboy." *Id.* Dews claims at that moment that Appellant said "I'm going to show y'all about me" and that he reached and grabbed a gun and cocked it and pointed it at Mass. *Id.* Dews added that by the time Appellant had drawn the weapon out, Whitt was also present in parking lot (RR 14/53).

14

Dews claimed that Appellant asked Mass as he pointed the gun if they were trying to jump him and Dews put his hands up and said this "ain't that type of party." (RR 14/55). Dews estimated he was 5 feet from Appellant at that time. *Id.* Whitt denied seeing Dews walk toward Appellant (RR 15/33) (Whitt instead claimed that Dews and Mass were together behind Mass' car). Dews then claimed he knelt down and picked up his jacket and then back away from Appellant (RR 14/57). He then testified that he heard a gunshot and saw Mass fall down to the ground. *Id.* Dews stated he then ran toward some cars in parking lot and Appellant began allegedly shooting at him. *Id.* Dews added that he saw no weapon on Mass (RR 14/62).

Whitt testified that when he followed Dews and Mass out of the mall he observed Mass taking off his sweatshirt at his car with his door open (RR 14/246). He denied seeing Mass with any weapon. *Id.* At the same time, Whitt saw Dews standing at the back of the car. *Id.* This testimony contradicts Dews' version of the events and confirms that Dews and Mass exited together and both confronted Appellant at the same time, thus justifying Appellant's multiple assailant defense theory. Whitt also testified that at that moment he saw a young lady getting out of the front seat of Appellant's car and walked towards the mall. *Id.* Whitt saw Appellant on the other side of the car in the back seat of his car. *Id.* (from this vantage point, Appellant had an obstructed view of what Mass and Dews were

15

doing at of Mass' car). This testimony was consistent with Appellant's confession in which stated that he exited the mall to give his girlfriend, Tamara Norris, his debit card to go in and purchase his shoes because there some individuals in the mall who were "tripping" (RR 15/89 and 92).

Ms. Norris testified that she had her vehicle parked in the mall parking lot next to a green vehicle that ultimately turned out to be Mass' (RR 15/88). Norris testified that she saw Appellant exit the mall first and then later saw Mass at the rear of the green vehicle and Dews standing by the driver's side of that vehicle (RR 15/93). Norris testified that as she was walking toward the mall, she heard the racking of a gun and took off running into the mall (RR 15/97).

Whitt testified that he walked up to Appellant while he was in the backseat and that "y'all don't need to be doing this" (RR 14/247) and (RR 15/26) ("He [Appellant] had, like, his hands in the car, top part of his body"). Whitt testified that Appellant had his gun cocked and he walked toward the back of the car "like, towards Mass and then stopped at the back of the car. Then pointed the gun at Mass." *Id.* Whitt testified that he told Appellant to put the gun down. *Id.* ("If y'all going to fight, y'all going to fight. You don't need to have a weapon or whatever"). Appellant answered and said "No. Y'all trying to jump me." *Id.*

Whitt added that Appellant stood with the gun pointed at Mass and asked if they were not going to all jump him, then why did Mass have his sweater off. *Id.*

16

("And then the gun went off …"). This evidence again affirms that Appellant was confronted by multiple assailants prior to opening fire on Mass and Dews. Whitt saw two shots hit Mass and then as he took off running he heard a third shot (RR 14/248). Whitt recalled that he heard two more gunshots and then he turned around and saw Appellant "put the gun down and he called the police …" *Id.*

Detective Craig Shine of the Tyler Police Department took a recorded statement from Appellant after the incident. Appellant stated that when he ran into Dews at the mall, Dews stood up and challenged him to a fight and that he [Appellant] walked away from the fight (RR 16/243). Appellant stated after the verbal exchange with Dews he exited the mall and went to the passenger side of Tamara's car to give her his debt card to return back to the mall to purchase the shoes (RR 16/234). He then walked around the back of Tamara's blue Fiesta to organized all the things he had in the backseat (RR 16/246) (according to Norris, this included Valentine's Day cards for his son's class and a hat that he was planning to take to the funeral) (RR 15/). *Id.* Appellant was dressed for a funeral and he stated that he had no intention of fighting because he had no other shoes in his car and the shoes he was wearing had no traction on them (RR 16/251).

At the time that Appellant was at the backseat of the Fiesta, Dews came out of the mall and was about 5 to 6 feet away from him (RR 16/246). Mass was about 20 feet away. *Id.* Although Appellant stated he did not see a weapon on either

17

Dews or Mass, he fired on Mass out of a concern that Mass was going to retrieve a weapon from his car (RR 16/235) (Appellant was in the backseat area of the Fiesta and his view of Mass was obstructed). At the time he fired the shots, Appellant stated to police that he had no intention of killing Mass (RR 16/241) (Appellant shot Mass 3 times). Appellant maintained in is voluntary statement that the reason he shot Mass was because he feared for his life. *Id.*

On cross-examination, defense counsel confirmed that immediately after the shooting incident, Appellant put down his gun and called 911 for assistance (RR 16/275). He therefore had no intent to flee the scene because he believed his actions were justified.

Detective Shine acknowledged that he was the lead detective on this case and to his knowledge none of the officers on scene searched the bushes, hedges, trees and shrubbery around the mall for the existence of a possible second gun (RR 16/270). Detective Shine also did not know if any officers searched the rain gutters and drainage areas around the mall for a second gun (RR 16/271). Detective Shine acknowledged that there were dumpsters around the vicinity of the JC Penney side of the mall and that he was unaware whether any officers searched those dumpsters for a weapon (RR 16/272). Also, Detective Shine was unclear as to whether any officers searched the rooftop area of the mall for a weapon. *Id.* Also troubling was that despite the fact officers knew that Dews drove to the mall that

18

day, they secured, but failed search his car for weapons (RR 16/273). Officers also failed to search Whitt's or Smith's vehicles for weapons (RR 16/275).

Detective Shine also testified that based upon his review of the JC Penney video he could not see Appellant in anyway provoke Mass (RR 16/286). Detective Shine also acknowledged that Mass is a very "big guy", 6 foot 5, 235 pounds. *Id.* In fact, Dews and Whitt were also good-sized individuals as well (RR 16/287).

These facts confirm that a rational fact finder could have found that Appellant had a reasonable belief that that deadly force was immediately necessary to protect him against a use or attempted use of unlawful deadly force by Dews and Mass.

Under Texas law of self-defense, a defendant's conduct is excused if he formed a reasonable belief that deadly force was immediately necessary to protect himself or a third party from another use or attempted use of unlawful deadly force. See TEX. PENAL CODE, § 9.32. The reasonableness of the belief is measured by the objective standard of an "ordinary and prudent man." See, TEX. PENAL CODE § 1.07(42); see also' *Davis v. State*, 104.W.3d 177, 181 (Tex.App.-Waco 2003, no pet.)("Although the jury employs an objective standard to determine the reasonableness of the defendant's belief, it must view the facts from the defendant's perspective."). Accordingly, Appellant is entitled to acquittal if a person in his position reasonably believed the deadly force was immediately

19

necessary to protect himself or another against the Dews' and Mass' use or attempted use of unlawful deadly force. TEX. PENAL CODE §§ 9.32, 9.33.

"Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. TEX. PENAL CODE § 9.01(3). "Reasonable belief means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor. TEX. PENAL CODE § 1.07(a)(42).

"The greater weight and preponderance of the credible evidence herein shows that [Neal] acted in self-defense from the apparent danger created by the attack of multiple assailants …, so that it is manifestly unjust" that he was convicted of murder. The jury's verdict to the contrary is, therefore, against the great weight of the evidence. Appellant was entitled to a verdict of not guilty as his acts were clearly in the defense of himself.

The State presented no evidence by which a rational finder of fact could find Appellant's use of deadly force to be unjustified, as Appellant was acting to defend himself. Appellant did not initially possess a deadly weapon and instead retrieved his firearm from inside the vehicle only after he was confronted by Mass and Dews in the parking lot. *See, supra*. Assuming arguendo that the State brought sufficient evidence that Appellant possessed a deadly weapon, the State brought no evidence that Appellant would not have sufficient justification for arming himself with the

20

firearm. It was not disputed that Mass and Dews were both large men (RR 16/287), that they pursued Appellant outside of the mall in order to fight him (RR 14/44), and that they were the aggressors in this exchange.

Consequently, the jury's rejection of his justification of self-defense and the jury's subsequent verdict was not rational. Accordingly, this Court should, as it must, enter an order reversing the judgment entered in the court below and thereafter enter a judgment of acquittal.

Therefore, the evidence is legally insufficient to support Appellant's conviction for murder because there was sufficient evidence that the Appellant acted in self-defense. It was only through speculation that the jury could have found beyond a reasonable doubt that Appellant did not reasonably believe the force he used against Mass was necessary to defend himself. Such speculation does not equate with beyond a reasonable doubt and cannot stand. No rational finder of fact could have found beyond a reasonable doubt that Appellant was not defending himself. For these reasons, Appellant's conviction of murder must be reversed and reformed to show an acquittal. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

## Issue Number 2

The trial court erred in limiting Appellant's ability to elicit testimony establishing the alleged victim, Mass', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case.

### Standard of Review

The trial court's decision to exclude 404(b) evidence is reviewed by this Court for an abuse of discretion. *McDonald v. State,* 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

### Argument

The trial court erred in limiting Appellant's ability to elicit testimony establishing the alleged victim, Mass', gang affiliation and how that evidence demonstrated his justified use of deadly force in this case. Prior to the start of the State's case, Appellant requested that the trial court admit evidence that the alleged victim, Christopher Mass, was as suspected member of the violent street gang know as the West Side Crips (RR 13/290) (this information was provided to Appellant in a communication to defense counsel from the State's gang expert, Tyler Police Detective Chris Miller) (RR13/10 and 287).

> Based on that letter and based on my conversation with Detective Miller, I believe that there is strong evidence that Chris Miller -- excuse me -- Chris Mass, the deceased, was an active member of the West Side Rolling Crips, a gang here in Tyler ….

22

*Id.*

Appellant argued that this evidence was relevant to show Mass' reputation has a "thug" and to establish his intent at the time of the shooting (RR 13/288). The State's position was that because Appellant did not know Mass, he had no knowledge of his violent character prior to the shooting (RR13/290). The State added that Mass' gang affiliation would not be admissible because there was no evidence to suggest that he was the "first aggressor." *Id.*

The trial court sided with the State noting that the gang evidence was not admissible because there was no evidence adduced pretrial to suggest Appellant knew Mass (RR 14/11). The court added that although there was a very narrow exception in the law for admissibly of such evidence when the defendant and victim do not know each other, the facts proffered by the parties to that point did not suggest this case fell into that exception. *Id.*

On cross-examination, Jonathon Dews testified that he knew Mass "through friends" (RR 14/97). When defense counsel attempted to expand upon this point to establish that these "friends" he knew Mass through were members of the West Side Crips the State objected citing the motion in limine and the court's prior ruling (RR 14/97-98). The court sustained the State's objection and excluded Appellant from exploring this area further

23

(RR 14/98).

Appellant again attempted to elicit similar evidence of Mass' gang affiliation through the testimony of Jimmy Whitt (RR 15/4). Whitt testified that he knew Mass "from the streets." *Id.* The State immediately objected that this line of questioning opened the door to character evidence concerning Mass' gang membership (RR 15/4-5). Again, Appellant was forced to abandon this line of questioning due the trial court's ruling in limine *Id.* (the trial court granted the State's motion in limine and excluded any gang evidence until, and if, that evidence became relevant) (RR 13/6).

Whitt also testified that he knew another State witness and friend of Mass, Quintin Smith, from "in the streets" (RR 15/22). Defense counsel later asked Quintin Smith how he knew Mass and Smith said he knew him from "being out, clubs, stuff like that" (RR 15/65). The State again immediately objected citing that this line of questioning also invited violation of their motion in limine concerning Mass' gang membership. *Id.*

> Judge, this is the same line of improper character evidence Mr. Davidson has been getting into with every single witness: Vernacular of "in the streets" and "around the way" and how he keeps insinuating this is something other than casual acquaintance is improper character evidence under 404.

*Id.*

Defense counsel responded that when these witnesses continue to respond that they know Mass from "on the street", this sort of testimony opened the

24

door to further inquiry (RR 15/66). Although the trial court allowed Appellant to inquire further, the court's limitation with respect to specific evidence of Mass' gang membership greatly hampered the defense. *Id.*

The rules of evidence permit the defendant to offer evidence concerning the victim's character for violence or aggression on two separate theories when the defendant is charged with an assaultive offense, as Appellant is in this case. *See Mozon v. State*, 991 S.W.2d 841, 845 (Tex. Crim. App. 1999) (setting out the two theories for admitting evidence of victim's character for violence); *see also Fry v. State*, 915 S.W.2d 554, 560–61 (Tex. App.-Houston [14th Dist.] 1995, no pet.) (discussing the history and rationale for both theories of admitting evidence of the victim's character for violence).

First, a defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the "reasonableness of defendant's claim of apprehension of danger" from the victim. *Torres v. State*, 71 S.W.3d 758, 760 & n. 4 (Tex. Crim. App. 2002) (evidence of victim's prior specific violent acts may be admitted to show the reasonableness of defendant's fear if he was aware of those specific acts); *Dempsey v. State*, 159 Tex. Crim. 602, 266 S.W.2d 875, 877–78 (Tex. Crim. App. 1954) (prior specific acts of violence by the victim offered by the defendant are admissible if (1) offered to show the reasonableness of defendant's claim of apprehension of danger, and (2) the acts of violence or

25

misconduct were known to the defendant at the time of the homicide). This is called "communicated character" because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not. *See Mozon,* 991 S.W.2d at 846 (when defendant's claim of self-defense rested on a perceived danger from victim, defendant could present evidence of victim's violent character to show her reasonable belief that force was immediately necessary to protect herself from the victim's perceived threat). This theory does not invoke Rule 404(a)(2) because Rule 404 bars character evidence only when offered to prove conduct in conformity, *i.e.,* that the victim acted in conformity with his violent character.

Although Appellant did not know Mass and was unaware of his character for violence, he was nevertheless entitled to offer evidence of Mass' gang affiliation because it justified has shooting in self-defense. A defendant claiming self-defense in a homicide prosecution may introduce evidence of a deceased's violent character to show the reasonableness of his/her fear of danger or to show the deceased was the first aggressor. *Torres v. State,* 71 S.W.3d 758, 761 (Tex. Crim. App. 2002). The evidence must be admitted through opinion or reputation testimony. Tex. R. Evid. 405(a). The Court of Criminal Appeals in *Mozon v. State*, 991 S.W.2d 841 (Tex. Crim. App. 1999) established what a defendant must prove: (1) to show Defendant's perception of danger was reasonable requires a showing of being

26

aware of the deceased's violent character; or (2) to show the deceased was the first aggressor does not require a showing of Defendant having personal knowledge of the deceased's violent character. *Id.* at 845. Further, the specific bad acts need not be addressed to or known by the defendant in order to be admissible, if they have a purpose apart from character conformity. *Torres v. State.,* 71 S.W.3d 758 (Tex. Crim. App. 2002).

Moreover, in *Ex parte Miller,* the Court of Criminal Appeals clarified that evidence of a deceased's reputation for violence is relevant to the Defendant's state of mind. *Ex parte Miller,* 330 S.W.3d 610 (Tex. Crim. App. 2009). The Court of Criminal Appeals called the evidence as "communicated character" because the Defendant is aware of the deceased's "violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not." *Id.* at 618. Here, the Appellant was not trying to prove that the deceased was violent; rather, he was attempting to prove his self-defense state of mind and the reasonableness of the state of mind. The evidence of gang affiliation could lead a jury to conclude that Appellant's use of force was reasonable because he had reason to believe the deceased would attempt an unlawful deadly force.

Alternatively, a defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor. Rule 404(a)(2) is directly applicable to this theory and this use is called "uncommunicated character" evidence because it does not matter if the defendant was aware of the victim's violent character. *See Mozon,* 991 S.W.2d at 845; *Tate v. State,* 981 S.W.2d 189, 192–93 & n. 5 (Tex. Crim. App. 1998); *see also Yantis v. State,* 49 Tex. Crim. 400, 94 S.W. 1019, 1021 (Tex. Crim. App. 1906) ("If there were threats of an un-communicated character, [defendant] could then prove the dangerous character of deceased as a man likely to execute such threats, in order that the jury might determine who was most likely the aggressor in the difficulty: both what occurred in the wash-room and what occurred at the time of the killing.").

In the present case, Appellant sought to introduce evidence that Mass was a member of the West Side Crips for the non-character purpose of establishing his specific intent or motive to attack Appellant. *See* Christopher B. Mueller & Laird Kirkpatrick, Federal Evidence § 103, at 569–70 (2d ed.1994).

> In describing the analogous federal rules, the professors state, Proof of specific acts of violence by the victim toward the defendant is often admissible to show hostility, plan, intent to inflict harm, and similar matters. Here the argument is not so much that the acts show character, hence conduct in conformity with character, but rather that the acts shed direct light on more particular aspects of the victim's

28

> outlook or state of mind toward the defendant, and the proof is admissible under FRE 404(b).

*Id.*

Such extraneous offense evidence is admissible under Texas Rule of Evidence 404(b). *See, e.g., Torres v. State,* 117 S.W.3d 891, 896–97 (Tex. Crim. App. 2003) (defendant was entitled to offer evidence that, several days before the murder, the victim had climbed through his ex-girlfriend's aunt's window and threatened her and her children; this evidence was relevant to show that the deceased had a specific motive or intent to be the first aggressor when he climbed through his ex-girlfriend's bedroom window early one morning and the defendant shot him); *see also Hayes v. State,* 161 S.W.3d 507, 509 (Tex. Crim. App. 2005) and *id.* at 509–10 (Keller, P.J., concurring); *Tate v. State,* 981 S.W.2d at 193 (Tex. Crim. App. 1998) (evidence of victim's prior specific acts may shed light on his intent or motive in the confrontation).

In *Tate*, the defendant was accused of stabbing his girlfriend's father during an altercation. *Tate*, 981 S.W.2d at 193. Tate took the stand at trial and testified that he acted in self-defense and that the victim was the aggressor in the altercation. *Id.* In support of his self-defense case, Tate attempted to offer testimony from his aunt about a conversation that the victim had with her a month or two prior to his death in which he made a threat that might "have to kill the little son of a bitch [Tate] some day." *Id.* at 190. The trial court excluded the

29

testimony as irrelevant because Tate was not present when the victim said this to his aunt. *Id.* Tate appealed this ruling and his conviction was affirmed by the Third Court of Appeals. *Id.* The Texas Court of Criminal Appeals reversed holding that the un-communicated threat was admissible under 404(b). *Id.* at 191 (holding the aunt's testimony about the threat to kill Tate was admissible to help demonstrate, not that the victim acted in conformity with his character, but that he had the intent or motive to harm appellant on the night in question. *Id.* at 193. Appellant cited *Tate* at trial and made a similar argument; that when Mass pursued him outside the mall he did so with the intent or motive of doing him harm (RR 13/290). A victim's prior specific acts of violence may be admissible if offered for a non-character purpose in the particular case, such as her specific intent or motive for an attack on the defendant. *See* Tex. R. Evid. 404(b); *Miller,* 330 S.W.3d at 620. But these specific acts are admissible only to the extent that they have relevance apart from their tendency to show character conformity. *Torres v. State,* 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

Appellant attempted to establish that the fact Mass was a Crip was probative, specifically with regard to his (Mass') violent and aggressive state of mind toward Appellant on the day of the shooting. *See Torres,* 71 S.W.3d at 762 ("For purposes of proving that the deceased was the first aggressor, the key is that the

30

proffered evidence explains the deceased's conduct."). Such evidence would have justified Appellant's self defense theory.

Although Rule 404(b) prohibits the admissibility of gang affiliation evidence to show that a person acted in conformity therewith, such evidence is admissible for other purposes, such as proof of motive, intent, or identity. Tex. R. Evid. 404(b); *see also Williams v. State*, 974 S.W.2d 324, 331 (Tex. App.-San Antonio 1998, pet. ref'd.) (finding that evidence of defendant's gang affiliation was admissible to prove motive).

The trial court's ruling that Appellant was not permitted to even hint at Mass' gang membership impeded his ability to justify the shooting in this case as self defense. This error by the court was and abuse of discretion that harmed Appellant and requires reversal in this case.

## Issue Number 3

The trial court erred in limiting Appellant's cross-examination of State's witnesses to establish the alleged victim, Mass', gang affiliation and how that evidence demonstrated Appellant's justified use of deadly force in this case.

### Standard of Review

The trial court's decision to limit cross-examination is reviewed by the Court under an abuse of discretion standard. *See Matchett v. State*, 941 S.W.2d 922, 940 (Tex. Crim. App.1996).

## Argument

The trial court erred in limiting Appellant's cross-examination of State's witnesses to establish the alleged victim, Mass', gang affiliation and how that evidence demonstrated his justified use of deadly force in this case. Prior to the start of the State's case, Appellant requested that the trial court admit evidence that the alleged victim, Christopher Mass, was as suspected member of the violent street gang know as the West Side Crips (RR 13/290) (this information was provided to Appellant in a letter written by the State's gang expert, Tyler Police Detective Chris Miller) (RR13/10 and 287). The trial court granted the State's motion in limine to exclude such evidence (RR 14/11).

The trial court repeatedly prevented Appellant from cross-examining the State's witnesses concerning their possible ties to a violent street gang. On cross-examination, Jonathon Dews testified that he knew Mass "through friends" (RR 14/97). When defense counsel attempted to expand upon this point to establish that these "friends" he knew Mass through were members of the West Side Crips the State objected citing the motion in limine and the court's prior ruling (RR 14/97-98). The court sustained the State's objection and excluded Appellant from exploring this area further (RR 14/98).

Later in his cross-examination of Mr. Dews, defense counsel attempted to elicit testimony that on the day of the shooting the waistline on Mass pants was

down so low that his undershorts were hanging out making him look "like a violent thug" (RR 14/119). The court sustained the State's objection as to the relevancy of this testimony. *Id.* Appellant objected that the trial court's ruling was a limitation on his confrontation rights under the 6th Amendment. *Id.*

The Sixth Amendment should be liberally construed to give appropriate constitutional protection to the defendant. *Chew v. State*, 804 S.W.2d 633, 635 (Tex. App.-San Antonio 1991, pet. ref'd)). Accordingly, the Court of Criminal Appeals has emphasized that the right to cross-examination "includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility." *Virts v. State*, 739 S.W.2d 25, 29 (Tex. Crim. App. 1987). Moreover, any question asked of a witness on cross-examination, which might have a tendency to show the witness' credibility, is always a proper question. *Koehler v. State*, 679 S.W.2d 6, 9 (Tex. Crim. App.1984). Thus, the proper scope of cross-examination includes "all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only." *Id.* (citing *Jackson v. State*, 482 S.W.2d 864, 868 (Tex. Crim. App.1972)).

Although it is true that as it pertains to the Confrontation Clause, "trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant", such limitations cannot go so far as to drastically curtail a defendant's cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

In the present case, the trial court's repeated limitation of Appellant's ability to explore Mass' gang ties drastically curtailed his cross-examination as to leave him "unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *See Davis v. Alaska*, 415 U.S. 308, 318 (1973); *see also Johnson v. State*, 433 S.W.3d 546 (Tex. Crim. App. 2014). The trial court's limitation on Appellant's cross-examination on this subject greatly limited his ability to establish his self-defense claim. If permitted to explore such indicators of street gang affiliation, Appellant would have been able to leave the jury with a "*significantly different impression* of [the witness's] credibility" *Id.* The trial court's error in this respect was an abuse of discretion and necessitates the reversal of Appellant's conviction.

## Issue Number 4

The trial court erred in granting the State's proposed jury instructions negating Appellant's claim of self-defense.

## Standard of Review—Jury Instruction Error

This Court reviews jury charge error in a two-step process. *Ngo v. State,* 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). First, to determine whether error exists in the charge. *Id.* If it does, then to review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.* When, as in this case, the Appellant properly objected to the error in the jury charge, reversal is required unless the error was harmless. *Id.* at 743.

## Argument

At the close of the evidence in the guilt/innocence trial, the court conducted a charge conference to discuss the proposed jury charge (RR 17/149) (CR 334) (Court's proposed jury charge). Both the State and defense counsel filed proposed jury charges for the trial court's consideration (CR 347) (State's proposed jury charge) and (CR 352-72) (Defendant's proposed jury charge).

Appellant's proposed jury charge stated in part as follows:

If you have a reasonable doubt as to self defense, you must acquit the Defendant and say by your verdict, "Not Guilty."

Under our law, a person is justified in using force against another wen and to the degree that he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.

…

A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, and when

he reasonable believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

…

When a person is attacked with unlawful deadly force, or he reasonably believes he is under attach or attempted attack with unlawful deadly force by one or more persons, and this is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury to himself at the hands of such attacker or attackers, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack.

It is not necessary that there be an actual attack or actual attempted attack, as a person has a right to defend his life from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the attacker's, or attackers's [sic], use or attempted use of actual or apparent unlawful deadly force.

A person who has a right to use deadly force to defend himself against one alleged attacker also has a right to use deadly force to defend himself against a second or subsequent perceived attacker who is with the first attacker if he reasonably believes that he is in immediate danger of death or serious bodily injury at the hands of either the first or the second or subsequent attacker.

(CR 363-64)

The State's proposed charge requested that the court instruct the jury that

under Texas Penal Code § 9.31:

(b) The use of force against another is not justified: … (3) if the actor consented to the exact force used or attempted by the other; (4) if the actor provoked the other's use or attempted use of unlawful force,

36

unless: (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and (B) the other nevertheless continues or attempts to use unlawful force against the actor; or (5) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was: (A) carrying a weapon in violation of Section 46.02; or (B) possessing or transporting a weapon in violation of Section 46.05.

Tex. Penal Code Ann. § 9.31 (West 2012).

The State essentially argued that Appellant was not entitled to raise a self-defense or multiple assailants claim if he: 1) consented to the exact force used or attempted by the other; 2) provoked the other's use or attempted use of unlawful force; or 3) sought an explanation from or discussion with the other person concerning the actor's differences with the other person while Appellant was either carrying a weapon in violation of Section 46.02; or possessing or transporting a weapon in violation of Section 46.05. (RR 17/169).

Defense counsel objected to the State's proposed charge because it essentially negated the self-defense and multiple assailant instructions previously approved by the trial court (RR 17/172) ("it would be improper to have a counter instruction … in the jury charge that, essentially eliminates Mr. Neal's right to self-defense … protection under the circumstances of this case"). *Id.*

The trial court overruled Appellant's objection and included the following instructions in the jury charge:

> The use of force against another is not justified … (3) if the actor provoked the other's use or attempted use of unlawful force; or (4) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person **while the actor was unlawfully carrying a handgun.**

(CR 335) (emphasis added).

Although the trial court included a self-defense and multiple assailants instruction in the final charge (CR 335-36), the inclusion of the additional instruction quoted supra essentially negated Appellant's affirmative defenses and thereby cancelled-out the self-defense and multiple assailants instructions.

The evidence presented at trial in this case in no way, shape or form suggested that Appellant sought an explanation or discussion with Mass and/or Dews at the time he armed himself with a firearm. To the contrary, the evidence is undisputed that Mass and Dews followed Appellant outside the mall and that they confronted him in the parking lot just prior to Appellant retrieving his firearm from the backseat of his girlfriend's vehicle. The same holds true with respect the absence of any provocation of Mass and Dews by Appellant.

38

A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, un-impeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gaspar,* 327 S.W.3d 349, 356 (Tex. App.—Texarkana 2010, no pet.) (citing *Ferrel v. State,* 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). There must be some evidence, when viewed in the light most favorable to the defendant, will support the claim. *Id.* (citing *Ferrel,* 55 S.W.3d at 591; *Hill v. State,* 99 S.W.3d 248, 251 (Tex. App.-Fort Worth 2003, pet. ref'd)). "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Id.* (quoting *Shaw v. State,* 243 S.W.3d 647, 657 (Tex. Crim. App. 2007)).

Appellant cited *Barrios v. State,* 389 S.W.3d 382 (Tex. App.—Texarkana 2012) in support of his claim that his alleged unlawful possession of a firearm did not negate his justified use of force in this case. In *Barrios,* the defendant objected that the trial court erred in failing to submit a self-defense instruction. *Id.* at 393. The State argued that the facts did not support a self-defense instruction because Barrios was engaged in other criminal activity as defined under § 9.31(a)(3), namely violation of the federal law concerning possession of a firearm by an illegal

immigrant. *Id.* The Texarkana Court of Appeals ultimately held that § 9.31(a)(3) of the Texas Penal Code did not encompass "other criminal activity" to include a violation of a federal criminal code. *Id.* The court ultimately held that Barrios was not entitled a self-defense instruction because he failed to offer any proof that he feared for his own safety. *Id.* at 394.

The court also noted, however, that had Barrios presented sufficient proof of fear, the simple fact he was also engaged in other criminal activity at the time of the shooting would not have negated his right to a self-defense instruction. *Id.* at 393. Instead, such a finding of engagement in other criminal activity would have simply removed the presumption that his actions were reasonable under § 9.31. *Id.* Stated otherwise, Barrios would have been entitled to the self-defense instruction but would have also had the burden of proving his actions were reasonable.

In the present case, defense counsel argued that the reasoning in *Barrios* did not negate Appellant's right to claim self-defense if it was proven to the jury that he unlawfully possessed a firearm. Counsel argued that *Barrios* did not negate self-defense, but that it simply took away a defendant's presumption of reasonableness. While defense counsel was correct in this respect, *Barrios* also notes that "commission of a crime under Section 9.31(a)(3) removes the presumption of reasonableness, whereas commission of acts under Section 9.31(b) renders the use of force against another unjustified." *Barrios*, 389 S.W.3d at 394. The court in the

present case nevertheless wrongly construed *Barrios* as supporting the proposed instruction and as a consequence negating Appellant's self-defense claim.

The court noted that Barrios was accused a carrying a shotgun while outside of his vehicle and that this act by Barrios did not trigger any "illegality" under the law (RR 17/176) ("concealed handgun weapons, though, make a completely different event; and that's what we're dealing with in this case. That this person [Barrios] was brandishing a shotgun at the event in question, there's no unlawful carrying of a weapon charge that could be made"). *Id.* The trial court presumed that since there was no argument raised in *Barrios* concerning the unlawful carrying of firearm under § 9.31(b)(5)(A), and no other authority on point presented by the parties, that the State's proposed instruction was appropriate (RR 17/176).

The court, however, failed to consider the fact that the instruction under § 9.31(b)(5)(A) requires that for self-defense to be "unjustified", the actor must have "sought an explanation from or discussion with the other person concerning the actor's differences with the other person **while the actor was unlawfully carrying a handgun.** (CR 335) (emphasis added). Nothing in the trial record even remotely suggests that at the time Appellant retrieved his firearm from the rear of his girlfriend's vehicle that he sought an explanation or discussion from either Mass or Dews (RR 17/184-85)

41

> You Honor, I object to this because the facts and evidence that were presented from the witnesses, particularly Detective Shine, indicate that the Defendant never sought a meeting with Mr. Mass, ever; that he never had a conversation with Mr. Mass; and that he never met or know Mr. Mass before the shooting.

*Id.*

As a consequence, the court's instruction had no place in the charge.

A charge on provoking the difficulty is properly given when: (1) self-defense is an issue; (2) there are facts in evidence which show that the deceased made the first attack on the defendant; and (3) the defendant did something intended and calculated to bring on the difficulty in order to have a pretext for self-defense. *See Matthews v. State,* 708 S.W.2d 835, 837–38 (Tex. Crim. App. 1986).

In *Bumguardner v. State*, 963 S.W.2d 171, 175 (Tex. App. 1998), Bumguardner was charged with murder for shooting a man, Hinton, who was seeing his wife. *Id.* at 172. The evidence established that on the day of the shooting, a witness overheard Bumguardner say he was going to kill Hinton. *Id.* at 175. That same witness also testified that on the night prior to the shooting, Bumguardner admitted to her that he had been looking for Hinton and his wife while he was carrying a gun. *Id.* On the day of the shooting, Bumguardner confronted his wife and Hinton in a convenience store and had words with them. *Id.* The court concluded that this established that Bumguardner and Hinton "had differences with each other." *Id.* Bumguardner testified that he packed a gun and went to a nightclub to look for his

wife. As Bumguardner exited the bar and walked toward his truck he confronted Hinton. *Id.* ("Bumguardner was upset and angry and words were exchanged … [he] demanded to know where his wife was"). The court ultimately concluded that the § 9.31(b)(5)(A) instruction was justified by the facts of the case because:

Evidence exists which shows that Bumguardner had differences with Hinton. **Bumguardner's demand to know where Sheila was and yelling at Hinton tends to show that he sought an explanation or discussion with Hinton while unlawfully carrying a gun**. Therefore, this evidence raises the issue that Bumguardner sought an explanation from Hinton and the court properly submitted this instruction to the jury.

*Id.* at 176 (emphasis added).

While the facts set forth in the *Bumguardner* opinion justified the court's instruction, the facts in the present case simply do not. In this case, there was no evidence in the record to suggest that Appellant carried his firearm on his person at the time he had his verbal confrontation with Dews and while in the presence of Mass. Moreover, although there was evidence to suggest that Appellant may have invited Dews outside of the mall to fight, it is once again clear that Appellant was not armed when he allegedly made that alleged invitation to fight. Appellant stated in his confession that Mass and Dews followed him out of the mall and into the parking lot. Appellant added that he retrieved his firearm out of his vehicle only after he observed Mass take off his hoody and place it inside the green Buick. He did so because he believed that Mass was intending to retrieve a firearm. Consequently the firearm was produced, not in furtherance of any effort by

43

Appellant to seek an explanation or discussion with Dews or Mass. Appellant retrieved the firearm in response to a perceived danger that Mass was about to come at him with deadly force. The evidence also establishes that Dews and Mass exited the mall and sought out Appellant. This set of facts, therefore in no way supports the giving of the above jury instruction by the trial court.

Also problematic about the court's charge is the fact that there was no evidence establishing that Appellant unlawfully carried a firearm at the time he retrieved it from the back of his girlfriend's vehicle. Section 46.02 of the Texas Penal Code provides that:

> A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun, illegal knife, or club if the person is not: (1) on the person's own premises or premises under the person's control; or (2) inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control. (a-1) A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun in a motor vehicle or watercraft that is owned by the person or under the person's control at any time in which: (1) the handgun is in plain view; or (2) the person is:
> (A) engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic or boating; (B) prohibited by law from possessing a firearm; or (C) a member of a criminal street gang, as defined by Section 71.01.

Tex. Penal Code Ann. § 46.02 (West).

Appellant was not a convicted felon at the time he retrieved the firearm from the vehicle. At the time Appellant retrieved the firearm, he was acting in self-defense

44

and was therefore not acting in violation of any criminal activity. Prior to the shooting, Appellant retrieved the firearm from his bag in the back floorboard of his girlfriend's vehicle. Therefore the firearm was not in plain view inside the vehicle. At the time shooting, Appellant's girlfriend was on her way into the mall to purchase Appellant's shoes. Accordingly, her vehicle was under Appellant's care and control. According to Detective Miller, Appellant was not a member of any known street gang. Consequently, there was no evidence offered at trial to support a finding that Appellant unlawfully carried a weapon. The court made no actual finding as to why Appellant was prohibited from possessing a firearm. The court therefore erred in allowing the § 9.41(b)(5)(A) jury instruction to go before the jury.

The trial court's error in allowing this instruction to go before jury had an undeniable harmful impact upon the verdict in this case. There can be no dispute the trial court's ruling to allow such an unsubstantiated charge to go before the jury was devastating to Appellant's self-defense case. As written, the instruction altogether negated his justification for the shooting. *See Ngo*, 175 S.W.3d at 744 (noting that to jury charge error exists if there was sufficient harm was caused by the error to require reversal of the conviction).

As noted supra, Appellant made a specific and timely objection to the State's self-defense counter instruction. Since Appellant preserved the error, this Court must reverse the decision it finds that he suffered any actual harm by the omission

of the defensive instruction. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The four-part analysis for assessing harm consists of reviewing (1) the entire jury charge; (2) the state of the evidence, including contested issues and weight of probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the trial as a whole. *Id.* Further, courts have determined that errors in the charge error properly preserved means the charge will require reversal "as long as the error is not harmless." *Id.* at 172. The Court of Criminal Appeals has determined this to mean that any harm, regardless of degree, is sufficient to require reversal. *Airline v. State*, 721 S. W. 2d 348, 351 (Tex. Crim. App. 1986).

It would be hard to envision a situation where Appellant suffered more harm by the court's undoing of the self-defense and multiple assailants instructions. Defense counsel extensively voir dired the jury on this issue and this was these were the sole defensive issues raised at trial. By denying Appellant the right to present the issues of self-defense and multiple assailants as defense to the charge, the trial court left the jury with no other possible alternative but to convict Appellant of murder.

The third factor in the *Almanza* analysis is the jury argument. This factor also weighs heavily in favor of Appellant. *See Dickey v. State*, 22 S.W.3d 490, 496 (Tex. Crim. App. 1999) (noting that during the closing arguments, the prosecutor made

several references to the multiple-assailants theory, despite the absence of said instruction in the charge). The prosecutor made repeated references in closing that Appellant's use of force was not justified:

> There was no force being used against Ricky Neal. There was absolutely not a stitch of evidence that said Ricky Neal was being attacked, was being punched, was being struck by a foot, nothing. Nothing.
> …
> Use of force is not justified, period. Now, you're going to hear, "Well, wait a minute. He felt threatened. He felt threatened by Christopher Mass."

(RR17/197-98).

> Why did Christopher Mass go out there? Because a buddy of his was getting in a fight with this cold-blooded murderer. He went out there, just like anybody would who they know is going to get in a fight. He walks outside behind him; stands 20 feet from Ricky Neal. According to Ricky Neal, 20 feet. Jon Dews is in front of him. Throws his hoodie in the car, comes around, and stands there, just like this.

(RR 17/215).

The State conceded during closing argument that Dews and Mass pursued Appellant out of the mall with the full knowledge that a fight was about to happen. It's therefore for laughable for the State to then suggest that Appellant had no reason to expect that he was in danger when he saw Dews and Mass pursue him outside the mall. This is especially ludicrous when the prosecutor himself confirmed in his closing that Dews was went out there to fight Appellant. Moreover, it was the prosecutor who also conceded in closing that Mass followed Dews outside with the

47

full knowledge that a fight was about to occur. And what did the prosecutor acknowledge that Mass did as soon as he got to his car? He took his hoodie off, thereby communicating to Appellant that he too planned to participate in the fight.

The State argued to the trial court that Appellant was not entitled to a multiple-assailant or self-defense instruction for the reasons stated supra. The prosecutor thereafter turned around in his closing argument and repeatedly presented the issue of multiple-assailants to the jury. Despite the fact that the State repeatedly invited the jury to believe that Mass and Dews went out there to fight Appellant, the jury was not allowed to render a decision based upon the self-defense and multiple-assailants instructions because the trial court essentially voided those defenses by modifying the charge as it did.

Appellant would therefore submit that the court's decision to negate his self-defense and multiple assailant instructions constitutes clear error and demands a reversal.

## Issue Number 5

The trial court erred in denying Appellant's request for a necessity instruction.

### Standard of Review—Denial of Proposed Instruction

This Court employs a two-step analysis when evaluating jury charge error. *See Abdnor v. State,* 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, this Court

determines whether error occurred and then evaluates whether sufficient harm resulted from the error to require reversal. *Wilson v. State,* 391 S.W.3d 131, 138 (Tex. App.–Texarkana 2012, no pet.) (citing *Abdnor,* 871 S.W.2d at 731–32).

## Argument

Appellant submits that reversible error occurred when the trial court denied his requested necessity instruction (RR 17/187-89) ("How do those facts, undisputed, admitted by your client to the jury, entitle him to any lesser charge other than outright murder"). Appellant's proposed necessity instruction stated that "when a person reasonably believes his conduct is immediately necessary to avoid imminent harm and the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards reasonableness … that person's conduct is justified …." (CR 364). Appellant ask that if the jury believed "from the evidence that on the occasion in question the Defendant reasonably believed, viewed from the standpoint of the Defendant at the time, that his conduct of shooting his pistol at Christopher Mass was immediately necessary to avoid imminent harm … then [he] should be acquitted" (CR 364-65).

An accused has a right to an instruction on necessity as a defense if it is raised by any evidence, however weak. *See Hamel v. State,* 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). One element of a necessity defense is that the accused reasonably believes that his otherwise illegal conduct is immediately necessary to

49

avoid imminent harm. *See* Tex. Pen. Code Ann. § 9.22(1) (Vernon 1994). In another context the Court of Criminal Appeals construed "imminent" bodily injury to require a present, not a future threat. *See Devine v. State,* 786 S.W.2d 268, 270 (Tex. Crim. App. 1989). In interpreting § 9.22 one court has held that imminent harm occurs when there is an emergency situation, and that conduct is immediately necessary if the actor is required to make a split-second decision. *See Smith v. State,* 874 S.W.2d 269, 273 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). In contrast, fear induced by one's presence in a high crime area is not sufficient evidence of immediate necessity to avoid imminent harm to justify unlawfully carrying a handgun. *See Johnson v. State,* 650 S.W.2d 414, 416 (Tex. Crim. App. 1983).

The plea of justification based upon necessity, like a plea of self-defense, must be assessed from the standpoint of the accused. The jury instruction is not called for unless there is evidence from the accused admitting the offense but claiming justification for having committed the offense because of other facts. *See Pentycuff v. State,* 680 S.W.2d 527 (Tex. App.—Waco 1984, pet. ref'd); *Klein v. State,* 662 S.W.2d 166 (Tex. App.—Corpus Christi 1983, no pet.). In the present case, defense counsel urged that Appellant was justified in raising a necessity defense. As discussed supra, Appellant was pursued outside of the mall by Mass and Dews and opened fire on them out of a genuine fear for his life. When Appellant observed

50

Mass reach into his vehicle, he became in fear that Mass would retrieve a weapon and cause him serious bodily injury. In response, Appellant hastily retrieved his firearm from inside his girl friend's vehicle and opened fire on Mass and Dews. Appellant did nothing while outside in the parking lot to provoke this advance by Dews and Mass and he was therefore entitled to an instruction under the necessity.

Deadly force is justified if the defendant would be justified in using force against the other, if a reasonable person in the actor's situation would not have retreated, and when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *See Carmen v. State*, 276 S.W.3d 538, 545 (Tex. App. 2008) (citing Tex. Penal Code Ann. § 9.32). The use of force against another is not justified if the actor provoked the other's use or attempted use of unlawful force unless the other nevertheless continues or attempts to use unlawful force against the actor. *Id.* § 9.31(b)(4)(B). A defendant "is justified in defending against danger as he reasonably apprehends it" as viewed in light of the evidence of the overt acts and words by the complainant, and there is no additional requirement that the jury find that the complainant was actually using or attempting to use unlawful deadly force against appellant. *Guilbeau v. State,* 193 S.W.3d 156 160 (Tex. App.—Houston (1st Dist.) 2006); *see Lavern v. State,* 48 S.W.3d 356, 360–61 (Tex. App.-Houston [14

51

Dist.] 2001, pet. ref'd); *Halbert,* 881 S.W.2d at 127; *Semaire v. State,* 612 S.W.2d 528, 530 (Tex. Crim. App. 1980).

Viewing the evidence in a light favorable to Appellant, the circumstances surrounding the shooting support the Appellant's reasonable belief that unless he resorted to deadly force, Dews and Mass would cause him serious bodily injury. *See Guilbeau,* 193 S.W.3d at 159–61. The trial court's denial of the necessity instruction once again resulted in a negation of his self-defense claim. *See Bumguardner,* 963 S.W.2d at 175 (noting that a charge limiting a defendant's right to self-defense under this section is properly given when (1) self-defense is an issue; (2) there are facts in evidence that show that the defendant sought an explanation from or discussion with the victim concerning their differences; and (3) the defendant was unlawfully carrying a weapon). The trial court therefore erred in refusing to charge the jury as to necessity concerning Appellant's need to defend himself with deadly force. The error occasioned by the court cannot be considered harmless because there was compelling evidence in the record to justify Appellant's belief that his life was in danger when both Mass and Dews exited the mall and confronted him in the parking lot. By denying the necessity charge, Appellant suffered great harm in his ability to demonstrate to the jury that his actions were necessary under the self-defense affirmative defense. *But see Butler v. State*, 663 S.W.2d 492, 496 (Tex. App. 1983) aff'd, 736 S.W.2d 668 (Tex. Crim. App. 1987) (noting that in a murder case,

however, where self-defense becomes the "immediately necessary" conduct, article 9.22 is rendered inapplicable). The undersigned would submit that this rule of law should be revisited as it applies to the facts of this case because as noted supra in Issue 4, the trial court all but negated Appellant's self-defense chances at the jury charge stage.

Here, because Appellant made a proper objection at trial, reversal is required if the error is "calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." *See Almanza*, 686 S.W.2d at 171 (noting that once an objection to a charge is properly preserved, this Court must reverse the conviction if appellant suffered any actual harm by the omission of the defensive instruction); *see also Abdnor v. State*, 871 S.W.2d 726 (Tex. Crim. App. 1994) (en banc) (holding that the level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error)*; see also* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). In other words, on appeal, Appellant needs to demonstrate only "some harm." *Abdnor,* 871 S.W.2d at 732; *see Almanza,* 686 S.W.2d at 171. Appellant has done so and his entitled to reversal as to the above stated error.

**Issue Number 6**

The trial court erred in its ruling that Appellant could not elicit testimony from defense witness, Wilmon Davis, that shortly prior to the shooting someone in the mall utter "he might get shot."

## Standard of Review

An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

## Argument

The trial court erred in its ruling that Appellant could not elicit testimony from defense witness, Wilmon Davis, that shortly prior to the shooting someone in the mall uttered the phrase "he might get shot." (RR 17/97). Defense counsel offered Mr. Davis testimony regarding this hearsay statement outside the presence of the jury. He testified that prior to the shooting, he was in the mall doing his walking exercises when he passed a group of males with "sagging" pants standing out front of Champs (RR 17/95). This group caught Davis' attention because he constantly admonishes his grandson not to wear his pants in that fashion because he looks like a gangster. *Id.* Mr. Davis distinctly recalled that Mr. Neal was not one of the men standing in this group (RR 17/95). As Mr. Davis made his last round of the mall, he overhead one of the males in that group say "he might get shot" (RR 17/96-97). As Mr. Davis later exited the mall, he saw Mass dead on the ground (RR 17/97). Davis recalled that Mass was one of the males standing in the

54

group that he overheard say either "he might get shot" or "he's going to get shot." *Id.* The last time Davis saw Mass in the mall, he saw Mass walking "out in front of J.C. Penney and went back on the east side, went out that side" (RR 17/100). After the shooting, Davis told Tyler police what he overheard (RR 17/99).

Defense counsel argued that the statement overhead by Davis was admissible as both and an excited utterance and a presence sense impression under the hearsay rules. A present sense impression is "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. *See* Tex. R. Evid. 803(1). There is no question that Davis "immediately after perceiving the event described that event to the Tyler police. The present sense impression exception to the hearsay rule is based upon the underlying premise that the contemporaneity of the event and the declaration ensures reliability of the statement. *Brooks v. State,* 990 S.W.2d 278, 287 (Tex. Crim. App. 1999). The closer the declaration is to the event the less likely there will be a calculated misstatement. *Id.* In the present case, Mr. Davis was interviewed by the police shortly after officers arrived on scene in response to the shooting. Therefore this testimony was admissible.

The rationale for the exception stems from the statement's contemporaneity, not its spontaneity, as one commentator has noted:

> If a person observes some situation or happening which is not at all startling or shocking in its nature, nor actually producing excitement

55

in the observer, the observer may yet have occasion to comment on what he sees (or learns from other senses) *at the very time that he is receiving the impression.* Such a comment, as to a situation then before the declarant, does not have the safeguard of impulse, emotion, or excitement, but there are other safeguards. In the first place, the report at the moment of the thing then seen, heard, etc., is safe from any error from defect of *memory* of the declarant. Secondly, there is little or no *time* for calculated misstatement, and thirdly, the statement will usually be made to another (the witness who reports it) who would have equal opportunities to observe and hence to check a misstatement. Consequently, it is believed that such comments, strictly limited to reports of *present* sense-impressions, have such exceptional reliability as to warrant their inclusion within the hearsay exception for Spontaneous Declarations.

Ray, 1A Texas Practice, Law of Evidence § 916, at 158–59 (3d ed.1980).

The trial court excluded Mr. Davis' testimony in part because he could not identify who in the group made the statement (RR 17/85) ("could be, if you can identify whoever the person was. But it sounds like neither side knows who said it, if anyone really did say it"). In *Green v. State,* 876 S.W.2d 226 (Tex. App.--Beaumont 1994, no pet.), a police officer testified, over objection, to a statement "attributed to two unnamed bystanders" that "the man in the brown trench coat was shooting." *Id.* at 227. On appeal, the court noted:

The record reflects that Officer Chatelain responded quickly to the gunshot occurring only a block away. The two witnesses were running from the direction of the gunshot. They were obviously describing an event that they had perceived almost immediately before encountering Officer Chatelain. Sufficient reliability existed for the statement to be admitted under the hearsay exception of Rule 803(1).

*Id.* at 228.

Just as in *Green*, Davis' testimony in this case had sufficient indicia of reliability and should have been admitted by the trial court. There is no disputing that this testimony was both relevant and probative to the issue of whether Mass and his group of thugs were the aggressors in this case. The proffered evidence by Davis would have certainly aided the jury in understanding the motive and intent of the group of gangsters in the mall prior to Mass exiting and confronting Appellant. *See Anderson v. State*, 15 S.W. 3d 177, 184 (Tex. App.—Texarkana 2000) (noting that statement of mind of the victim is relevant in cases involving defense claims of self-defense, suicide, or accident) *see also;* 2 Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 6:22 (15th ed. 1998 & Supp. 2000). The trial court's exclusion of this testimony was therefore an abuse of discretion.

## Issue Number 7

Trial counsel rendered ineffective assistance of counsel in failing to challenge whether the State's gang identification witness was qualified to render an expert opinion that Appellant was affiliated with a gang.

## Standard of Review-Ineffective Assistance of Counsel

The standard of review for Appellant's complaint of ineffective assistance of counsel is whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686 (1984); *see Davis v. State,* 278 S.W.3d 346, 352 (Tex.Crim.App.2009); *Diaz v. State,* 380 S.W.3d 309, 311 (Tex.

57

App.—Fort Worth 2012, pet. ref'd). The *Strickland* test has two prongs: (1) a performance standard and (2) a prejudice standard. *Strickland,* 466 U.S. at 687.

### Argument

During the punishment trial, the State called Tyler Police Detective Chris Miller to testify that based upon a review of Appellant's tattoos, Miller believed that he was a member of a violent street gang (RR 18/62). Miller testified as to his experience as a police officer, a youth crimes division investigator and his membership in the Texas Gang Investigators Association (RR 18/62-63). He also testified that he had conducted training in the areas of gangs and gang intelligence for the United States Attorney's Office, the Texas Attorney General's Office, University of Texas, Tyler Junior College and the Texas Gang Investigation Association. *Id.* Detective Miller did not testify as to any other qualifications that would be make him an expert in gangs including whether he ever testified in the past as a gang expert and how many times he's been qualified in court as a gang expert.[1]

The State at no point during Miller's testimony before the jury offered him as an expert witness.[2] The State simply asked Miller if he was the "gang guy" and

---

[1] The undersigned is familiar with Detective Miller having previously cross-examined him as gang expert and challenged his opinions on appeal. The undersigned therefore knows that Detective Chris Miller is recognized as an expert witness on criminal street gangs.

[2] After defense counsel objected to Miller's testimony under Texas Rules of Evidence 401, 402, 403 and 705(d), the State responded that "[a]s far as the 705 objection, obviously, Chris Miller has testified—and testified here today—

Miller responded "[t]hat's what they tell me." (RR 18/64). Defense counsel made no effort whatsoever to challenge Miller's qualifications as expert or the underlying data that he relied upon in reaching his ultimate conclusions in this case. Instead, trial counsel conceded on the record that Miller was an expert in gangs (RR 18/72) ("I do not contest the State's assertion that Detective Miller is an expert. I fully concur with that. That is not my argument").[3] The trial court did overrule counsel's objections under Rules 401, 402 and 403, but made no ruling with respect to the Rule 705(d) objection (RR 18/72) ("Well, I'll overrule the objection. 37.07 is very broad. I don't find, under 401, 402 or 403, that it should be excluded"). Defense counsel failed to press the court for a ruling as to the 705(d) objection and Miller was permitted to continue unchallenged with his opinions.

Detective Miller opined that the tattoos he observed on Ricky Neal's body appeared to be a "constant theme" among the Bloods or a Blood set (RR 18/73). Detective Miller thereafter went through photographs taken of each tattoo on Appellant's body and opined that the majority of those tattoos were consistent in on way or another with the Bloods street gang (RR 18/73-83) ("In my opinion it

---

based upon his training and experience, he's testified as an expert in this court before on numerous occasions. As a matter of fact, I believe that he qualifies as an expert based upon all of those factors that the Court must listen to in determining whether or not somebody is an expert …." (RR 18/72-73).

[3] Trial counsel raised objections under Texas Rules of Evidence 401, 402, 403, and 705(d) as they related to the relevance and probative value of Detective Miller's ultimate opinions because Appellant had a history as "gang affiliations" in Henderson, Texas and those past affiliations did not establish that he had any gang membership in Tyler where the shooting occurred (RR 18/71-72).

would be a high probability that he would be a member of a criminal street gang [A Piru Blood]") (RR 18/83).

On cross-examination, defense counsel had Miller run through an exhaustive list of the violent street gangs in Tyler (RR 18/84-86). Miller conceded that Appellant was not a "documented" member of any gang in Tyler (RR 18/86) (Miller expanded that the other than the tattoos, he had no evidence to prove Appellant was in an active member of any street gang in Tyler).   That was the extent of defense counsel's cross-examination Miller.

## A.    The Problem with Gang "Expert" Testimony

Like all expert testimony, the testimony of gang experts regarding gang membership must meet the relevance and reliability requirements of Texas Rule of Evidence 702. *See* Tex. R. Evid. 702 (West).  Rule 702, along with Rules 401, 403, and 703, require the trial judge to act as a "gatekeeper," limiting the testimony of expert witnesses. *See* Judge Harvey Brown, *Eight Gates for Expert Witnesses*, 36 Hous. L. Rev. 743, 744 (1999)*; see also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587 (1993)* (announcing that *Federal Rule of Evidence 702* superseded the general acceptance test for expert witness testimony articulated in *Frye v. United States* seventy years earlier); *Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)* (promulgating the general acceptance test for the admissibility of expert witness

testimony); David E. Colmenero, A Dose of Daubert to Alleviate "Junk Science" in Texas Courtrooms: Texas Adopts the Federal Standard for Determining the Admissibility of Scientific Expert Testimony, *27 Tex. Tech L. Rev. 293, 294 (1996)* (asserting that judges have an affirmative duty to determine relevancy and reliability of expert testimony). Expert testimony offered pursuant to Rule 702 must survive a traditional relevancy analysis under Rules 401 and 402 of the Texas Rules of Evidence. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995) (noting Texas Rule of Evidence 702 requires the evidence to "assist the trier of fact to understand the evidence or to determine a fact in issue").

Additionally, the scientific technique or procedure must be reliable. *See Robinson, 923 S.W.2d at 557.* When determining the reliability of a scientific technique or theory, a trial court may consider any number of factors, including but not limited to: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theory or technique. *Id.*; *see also Daubert,* 509 U.S. at 593-94 (stating that many factors are considered when determining reliability).

Similarly, the testimony of experts testifying about nonscientific matters must be both relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (concluding that a trial judge's "gatekeeping" duty applies to both scientific and nonscientific expert testimony). Nonscientific expert testimony presents trial courts with special concerns. *See* Emily L. Baggett, Note, *The Standards Applied to the Admission of Soft Science Experts in State Courts*, 26 Am. J. Trial Advoc. 149, 156 (2002) (stating that judges may find it difficult to distinguish between scientific and nonscientific evidence). For example, nonscientific testimony may be based on experience and observation that cannot be objectively tested. *Id.* Because nonscientific disciplines do not lend themselves to systematic scrutiny based on objective retesting, the data often cannot be validated. *See Weatherred v. State*, 15 S.W.3d 540, 542 n.5 (Tex. Crim. App. 2000) (stating that "the 'hard' sciences, areas in which precise measurement, calculation, and prediction are generally possible, include mathematics, physical science, earth science, and life science," whereas "the 'soft' sciences, in contrast, are generally thought to include such fields as psychology, economics, political science, anthropology, and sociology"). Also, nonscientific expert testimony may be more difficult to attack through cross-examination. Jason G. Duncan, Note, *"A Pig's Breakfast": Judicial Gatekeeping for Scientific and Specialized Expert Testimony*, 6 Suffolk J. Trial & App. Advoc. 21, 30 (2001). Thus, "there is less assurance of the accuracy and truthfulness of

62

nonscientific expert testimony." Edward J. Imwinkelried, *The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L. Rev. 2271, 2279 (1994).

Texas courts consider the *Daubert/Robinson* factors when deciding whether nonscientific evidence is reliable. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). In cases where the expert's opinion is based more on skill and experience, courts may not find the factors listed in *Daubert* and *E.I. du Pont* helpful in determining the reliability of the expert's testimony. *Gammill*, 972 S.W.2d at 726 (stating that *Daubert* and *Robinson* considerations are not always useful in assessing nonscientific testimony). In these cases, courts are charged with determining whether there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Gammill*, 972 S.W.2d at 726. The crucial inquiry in the "analytical gap" test is whether the expert relied on objective data or experimentation, or subjective interpretations. *See Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 263 (Tex. App. - San Antonio 1999, pet. denied) (identifying the concern as whether experts relied on subjective interpretation or on objective data or interpretation). Texas courts have consistently held that expert opinions with little more than a "subjective belief or unsupported speculation" are unreliable and therefore inadmissible. *Gammill*, 972 S.W.2d at 728; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

63

In Texas, the analysis employed to determine how the reliability of particular expert testimony is to be assessed is within the trial judge's discretion. *Gammill*, 972 S.W.2d at 726. Further, whether a court analyzes the reliability of an expert's testimony using the Daubert/Robinson factors, the "analytical gap" test, or a combination of the two, "in light of the increased use of expert witnesses and the likely prejudicial impact of their testimony, trial judges have a heightened responsibility to ensure that expert testimony show some indicia of reliability." *Robinson*, 923 S.W.2d at 553. In short, "it is not so simply because 'an expert says it is so.'" *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987)).

In Texas, the reliability and relevance requirements of Daubert apply to both scientific and nonscientific expert testimony. *Gammill*, 972 S.W.2d at 726 (applying *Daubert* to all expert testimony). Texas courts require that a nonscientific expert's skill and experience reflect the relevance and reliability of his testimony in order for the testimony to pass through the methodological gate. *Id.* at 722. And, although "reliability ... does not ... always require an examination of the *Daubert/Robinson* factors ... the gatekeeping reliability requirement of *Daubert* applies to all experts." Judge Harvey Brown, *Eight Gates for Expert Witnesses*, 36 Hous. L. Rev. 743, 803-04 (1999).

Courts are also required to examine the foundational reliability of expert testimony. *Id*. at 823. *Daubert* acknowledged that expert testimony must have "a reliable foundation." *Daubert, 509 U.S. 579, 597 (1993).* "The foundational-reliability gate ... focuses on the reliability of studies, articles, and data from others in the expert's field and the assumptions of the expert." Judge Harvey Brown, *Eight Gates for Expert Witnesses*, 36 Hous. L. Rev. 743, 821 (1999). The expert's testimony that the research is reliable is not enough. *Id.* Simply put, "if the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Merrell*, 953 S.W.2d at 714.

Typically, the gang expert's testimony is lacking reliability, both methodological and foundational. Placido G. Gomez, *It is Not So Simply Because an Expert Says It's So: The Reliability of Gang Expert Testimony Regarding Membership in Criminal Street Gangs: Pushing the Limits of Texas Rule of Evidence*, 702, 34 St. Mary's L.J. 581, 605 (2003). First, because the information upon which the gang expert relies comes from highly unreliable sources, there is no credible data upon which the officer can base his opinion. *Id.* Second, even though the available research indicates that individual gangs are often quite unique, gang experts across the country base their opinions on definitions and criteria that are strikingly similar. *Id.*

The research and available information regarding gangs, gang membership,

65

and gang-related activity suffers from inaccurate reporting. *Id.* An overwhelming amount of information regarding gangs originates with two "highly suspect" groups of reporters - gang members and those who process the data, such as police officers and service providers. *Id.* The perspectives of these groups can sometimes be "self-serving and often unverifiable." *Id.* Gang members, the primary data source for both law enforcement agencies and researchers, "tend to conceal and exaggerate and may in fact not know the scope of the gang's activities." *Id.* at 606. Law enforcement personnel and social service providers often respond to information from the media, another notoriously unreliable source. *Id.* Consequently, "there is no coherent, precise body of knowledge on gang behavior or gang activity to synthesize officers' street experience." *Id.* Funding formulas often tempt police departments and social service agencies to exaggerate gang activity. *Id.*

Most agencies across the country still identify gang members using a set of criteria introduced by the California Youth Gang Task Force in 1988. *Id.* at 610. These factors include:

> (1) Subject admits being a member of a gang[;]
> (2) subject has tattoos, clothing, etc., that are only associated with certain gangs[;]
> (3) subject has been arrested while participating in activities with a known gang member[;]
> (4) information that places the subject with a gang has been obtained from a reliable informant[; and]
> (5) close association with known gang members has been confirmed.

*See* Jeffrey J. Mayer, *Individual Moral Responsibility and the Criminalization of Youth Gangs*, 28 Wake Forest L. Rev. 943, 965-66 & n.126 (1993).

Identification as a street gang member based on clothing, colors, or tattoos, is unreliable. Placido G. Gomez, *It is Not So Simply Because an Expert Says It's So: The Reliability of Gang Expert Testimony Regarding Membership in Criminal Street Gangs: Pushing the Limits of Texas Rule of Evidence*, 702, 34 St. Mary's L.J. 581, 620 (2003). While clothing may reflect the collective identity of a street gang, it is more likely to indicate an individual's preference. *Id.* Young people often dress alike, particularly if the style rejects authority. The gang look has frequently become stylish as nongang members adopt the "dress, mannerisms, and behavior of hard-core street gangs." *Id.* The tendency of gangs to adopt designer clothing or clothes associated with popular sports teams makes it more difficult to distinguish gang members from other young people. *Id.* Finally, the more sophisticated gangs, especially those gangs engaged in entrepreneurial activities, will often hide their association with a particular gang and not show gang colors or wear clothes identified with a gang. *Id.* Thus, law enforcement officials cannot accurately identify gang members based on their clothes or colors, without more. *Id.*

**B.    Defense Counsel was Ineffective in Failing to Challenge the Basis for Miller's Opinions**

As noted *supra*, tattoos are also an unreliable identification tool. Many former

67

gang members have tattoos. *Id.* at 621 "Retired gang members bear the tattoos of their active days, whether they want to or not." *Id.* Moreover, tattoos are popular, especially with some minority communities. *Id.* Defense counsel failed to in any way challenge the data Miller used to make his conclusions that based exclusively on his tattoos, Appellant was a member of a violent street gang. Counsel's performance in this regard fell far below acceptable professional standards.

When considering whether counsel's performance was deficient, this Court must determine whether Appellant has shown by a preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness. *Strickland* 466 U.S. at 687–88. Although there is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance, in the present case the counsel's performance on this particular issue falls below that standard. *Strickland,* 466 U.S. at 689; *Diaz,* 380 S.W.3d at 311–12. The record in this case discussed supra affirmatively demonstrate counsel's ineffectiveness. *Thompson v. State, 9* S.W.3d 808, 814 (Tex. Crim. App. 1999). While it is true that "[t]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State,* 101 S.W.3d 107, 111 (Tex. Crim. App. 2003), in the present case there is not justification that counsel can offer to excuse such deficient performance. That is because the record in this case contains direct evidence of counsel's reasons for the challenged conduct; counsel

believed wholeheartedly that Miller was his expert and that his opinions were sound. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). As a consequence of this concession, counsel's challenged conduct constituted deficient performance conduct that was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

As for prejudice standard of *Strickland*, this Court must determine whether there is a reasonable probability that the outcome would have differed but for counsel's errors. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland*, 466 U.S. at 686; *Andrews v. State*, 159 S.W.3d 98 (Tex.Crim.App.2005). The reasonable probability must rise to the level that it undermines confidence in the outcome of the trial. *Diaz*, 380 S.W.3d at 312.

Counsel's conduct in this case meets the prejudice standard set forth supra with respect to the devastating outcome this evidence had upon both the guilt/innocence and punishment phases of Appellant's trial. With respect to the guilt/innocence phase, the primary reason that Appellant elected not to take the stand and expand upon his self-defense justification for the shooting was because his counsel feared what Miller's gang testimony would be in rebuttal.

Near the close of the defense's guilt innocence case, the trial court conducted the following inquiry:

69

MR. DAVIDSON:  The other issue, Your Honor, is that the State is aware, from communications from Detective Chris Miller, the Tyler PD's gang expert -- that Detective Miller, if called to testify, would testify that Mr. Neal is not affiliated with any gang in Tyler; was not a member of any gang in Tyler at the time of this shooting and has no gang affiliation for any gang in Tyler.

THE COURT: May be what he has to testify to. But if he has gang tattoos, those are relevant, typically. I didn't fully expect the trial would finish without us talking about gangs in front of the jury. But, again, just to make sure you have, I guess, what you presume to be an effective strategy of calling your client to the stand, waiving his privilege, testifying, knowing well that the State has evidence of at least potential admissible gang affiliation, that by doing that you're effectively suggesting that this -- I guess, where you're headed -- and really, just laying it out to see if I'm maybe missing something.

Because courts, unfortunately, have to always look at cases to make sure lawyers are effectively representing their clients. And whenever the Court sees them making a move that's maybe not so effective, from the Court's perspective, I think we have a duty to address it and make sure that you're not at least inadvertently stepping on the landmine, so to speak.
By introducing him, you introduce this issue, which introduces the gang issues into the case, which means maybe you get evidence in that Mr. Dews had some former type of gang connection or current. You may, may not get in anything about the victim because of the way the victim law is concerned.
But you, obviously, do go in eyes open, allowing the State to bring in evidence about your clients. So then if the jury, ultimately, determines that maybe this was a gang situation but only one of the gang members had a weapon -- I've heard zero evidence -- just so you understand what I've heard and what I think the jury's heard -- I've heard zero evidence of anyone
in the parking lot, other than your client, having a weapon. And I'm really just raising that because that's what I think I've heard. That's what I think the jury will have heard.

MR. DAVIDSON: Right.

70

THE COURT: As a result, if that's the only evidence, and you choose to also interject that your client may be a gang member tied to him being the only one having a weapon, seems like an extremely dangerous strategy to try to convince 12 individuals of self-defense, which is what you argued, really, from the start on it. So, again, I'm really -- I'm not going to restrict you in any way. But, really, to make sure that you are telling me that you're aware of all those things; and that, yes, even knowing all those things, this is the strategy you best believe helps your client.

(RR 17/130-32).

Thereafter, Mr. Neal asked to confer with his counsel (RR 17/133). Defense counsel then informed the court:

MR. DAVIDSON: Your Honor, he says he wants to testify and is well aware -- my client says he wants to testify, number one. Number two, he is aware of the hazards, potential landmines that the Court alluded to. I have been far more direct with him about those landmines; and I've specifically identified them for him. It's his right to testify, and he says that's what he wants to do.

THE COURT: Mr. Neal, if you'll stand again. You've had a few moments to speak privately with your lawyer, Mr. Davidson. He tells me, yet again, that he's gone over everything I've just told you, as well as probably many other things. It's your desire to -- knowing all those things, knowing that your case, very likely -- out of a fair reading, I think, at this point, the jury could be assessing your case of, really, what I think your lawyer has suggested to them, is that maybe you're the victim in the case; and that you came outside and two people came out and you had to go for your gun to defend yourself. That's pretty neutral. They don't really -- I don't think, out of a fair reading of the evidence, to this point, really think they could be thinking that it's really that simple. By taking the stand and these other issues coming in, the dynamics of that simple explanation really turn, I think, out of a fair-thinking person that I would presume jurors to be, to probably make a 180-degree turn; that they'll know a lot more information. They'll have a lot more suspicions about what might or

71

might not have happened out there, all of which will be before them, all of which will go into their digestive process of deciding what they think the real results are. So, again, knowing all those things, you've apparently told your lawyer that you've decided to waive your Fifth Amendment, go ahead and take the stand, and give testimony in your case? Because it is your privilege, as I've told you from the beginning. It's not the lawyer's. I think you should always get your lawyer's input and advice. But you don't have to follow that, even if he's telling you shouldn't get on the witness stand. Do you understand that?

THE DEFENDANT: (Nodding).

THE COURT: All right, sir. So, again, we're kind of at that place where I told you at the start of the trial that -- will he be your last witness?

MR. DAVIDSON: Yes, sir. Well, I correct myself, sir. There may be one more witness. That would be Detective Miller.
…

(Defendant confers with attorney.)

MR. DAVIDSON: Your Honor, my client has ordered me, first, to recall Mr. Dews; and, secondly, my client has just stated that he is now going to take the Fifth.

THE COURT: Is that true Mr. Neal?

THE DEFENDANT: Yes.

(RR 17/134-37).

Appellant ultimately elected not to take the stand and testify based upon the off-record discussions with his trial counsel and the trial court's input.

On April 10, 2014, the State filed its third supplemental notice of intent to call expert witnesses and listed as one of those witnesses, Detective Chris Miller

72

(CR 244). Had counsel bothered to file a pretrial motion under Rule 705 challenging the basis for Miller's expert opinion, he would have likely had the opportunity to litigate the admissibility of Miller's testimony prior to having to having the debate with his client as to potential detriments of Appellant taking the stand.

Texas Rule of Evidence 705(c) governs the reliability of expert testimony and states that "[i]f the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion under Rule 702 or 703, then the opinion is inadmissible." Tex R. Evid. 705(c); *see also Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006). If counsel would have filed the appropriate 705 pretrial motion, then the issue of whether Miller's opinions were supported by sound underlying facts and data could have been addressed in advance of Appellant's decision whether to testify or not. Armed with the information learned from the 705 hearing, counsel could have made a better-informed decision as to the potential risks associated with Appellant being called to the stand. Had Appellant been better informed as to the admissibility and limits of Miller's expert testimony he would have been far better equipped to make the decision whether or not to invoke his 5th Amendment right to not testify.

In self-defense trial such as this, a defendant's testimony can often make or break the case of whether his actions were justified or not. Although the strategic

decision of counsel whether to allow a defendant testify or not is not generally well developed enough on direct appeal to be reviewable, the record set forth supra in this case is sufficient to demonstrate counsel's justification for not calling Appellant to the stand. *See Jackson v. State*, 877 S.W.2d 768 (Tex. Crim. App. 1994). We know form the record in this case that Appellant had no felony convictions that would have come up if he testified.  It can therefore be presumed that the sole reason that he declined to testify had to do with the potential gang testimony of Miller. Counsel's failure to address the Miller testimony pretrial influenced Appellant's ultimate decision not to testify. This meant that the only evidence to support his self-defense claim came from his video interview the law enforcement. Appellant was denied the meaningful opportunity to elaborate on that interview with the jury and communicate the true extent of his justified fears at the time of the shooting. Appellant's decision not to testify, that was based upon counsel's deficient performance, had detrimental influence on the outcome of this case.

Counsel's deficient performance stated *supra* also had a detrimental influence upon the outcome of the punishment trial. Defense counsel failed to in anyway challenge the support for Miller's opinions with respect to the tattoos. Rather than refute Miller's findings that the tattoos were evidence of gang affiliation, counsel simply endeavored to concede he tattoos were proof of gang membership, but not documented gang membership in Tyler. Conceding this point most certainly had a

74

profound and detrimental impact upon the jury's decision to return a life prison sentence. *See DeLeon v. State*, 322 S.W.3d 375 (Tex. App. 2010) (holding defendant was prejudiced, and thus received ineffective assistance entitling him to new punishment hearing, by trial counsel's deficient performance at punishment phase of prosecution for indecency with a child by sexual contact in calling as expert witness a probation officer who gave inflammatory testimony on cross-examination about risks posed by sex offenders on probation)

## Issue Number 8

The trial court erred in denying Appellant's request lesser-included offense jury instructions.

## Standard of Review—Denial of Proposed Instruction

This Court employs a two-step analysis when evaluating jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, this Court determines whether error occurred and then evaluates whether sufficient harm resulted from the error to require reversal. *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.–Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

At trial, Appellant requested special jury instructions be included the charge for the lesser included crimes of manslaughter (CR 366-67), criminally negligent homicide (CR 367), deadly conduct (CR 368) (RR 17/182). The trial court denied Appellant's request for these special instructions.

Again, just so you're crystal clear with what I think this jury has heard,

that the evidence was that your client did the same thing that the admissions say, and that he pulled a gun out. And the gun inadvertently went off and shot this gentleman, yeah, maybe manslaughter, maybe recklessness is there. But whenever you start adding shot after shot, hitting the same person, as I said, I think it would be incredible that any higher court would suggest that, under those facts in this case, that your client would have any right to any lesser included offense charges.

(RR 17/182-83).

Chapter 9 of the Texas Penal Code recognizes certain justifications that, under Section 2.03, are defenses to prosecution. *See* TEX. PEN. CODE § 2.03(a) ("A defense to prosecution for an offense in this code is labeled by the phrase: 'It is a defense to prosecution ...' "); *see also* TEX. PEN. CODE § 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."). If there is some evidence that a defendant's actions were justified under one of the provisions of Chapter 9, the State has the burden of persuasion to disprove the justification beyond a reasonable doubt. *See* TEX. PEN. CODE § 2.03(d).

In the present case, Appellant raised evidence that he shot Mass while acting in self-defense, a Chapter 9 justification. *See* TEX. PEN. CODE §§ 9.31 (Self–Defense), 9.32 (Deadly Force in Defense of Person). Assuming a jury believes that a defendant's actions were justified under Chapter 9 (or has a reasonable doubt that the actions were justified under Chapter 9), the plain meaning of Sections 9.02 and 2.03 is that the fact-finder may not convict the defendant for an offense based on those actions. *See Alonzo v. State*, 353 S.W. 3d 778, 781 (Tex. Crim. App. 2011).

76

In the present case, the trial court erred in denying Appellant's request for these lesser-included offense instructions because the evidence at trial, including Appellant's own recorded confession, discussed supra justified inclusion of these instructions in the final charge.

"[A] lesser-included offense instruction shall be included in the jury charge if: (1) 'the requested charge is for a lesser-included offense of the charged offense; and (2) there is some evidence that, if the defendant is guilty, he is guilty *only* of the lesser offense.' " *Guzman v. State,* 188 S.W.3d 185, 188 (Tex.Crim.App.2006) (quoting *Hayward v. State,* 158 S.W.3d 476, 478 (Tex.Crim.App.2005)). Appellant in the present case met both of these burdens at trial.

The first step is a question of law that is determined by the pleadings and does not depend on the evidence produced at trial. *Hall v. State,* 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). An offense is a lesser included offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense. Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006).

77

"[T]he elements and the facts alleged in the charging instrument are used to find lesser-included offenses[.]" *Hall,* 225 S.W.3d at 535.

The statutory elements of deadly conduct would require that Appellant recklessly engaged in conduct that placed Mass in imminent danger of serious bodily injury. TEX. PEN. CODE ANN. § 22.05(a) (Vernon 2003). Recklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another. *Id.* at § 22.05(c). Appellant asserts that it was error for the court to refuse to instruct the jury on the offense of deadly conduct. The offense of deadly conduct can be committed in two ways. A person commits the misdemeanor version of the offense if he recklessly engages in conduct that places another in imminent danger of serious bodily injury. TEX. PENAL CODE § 22.05(a), (e). The felony version of deadly conduct occurs if a person knowingly discharges a firearm at or in the direction of one or more individuals. *Id.* § 22.05(b)(1). Thus, under these facts proven at trial in the present case, felony deadly conduct satisfies the first prong of the lesser-included test because it was included in the proof necessary to establish the offense of murder. *See* TEX. CODE CRIM. PROC. art. 37.09(1); *Ortiz v. State,* 144 S.W.3d 225, 233–34 (Tex. App.–Houston [14th Dist.] 2004, pet. ref'd).

"The second step in the analysis should ask whether there is evidence that supports giving the instruction to the jury." *Id.* at 536. "[A]nything more than a

scintilla of evidence may be sufficient to entitle a defendant to a lesser charge." *Id.*

"[T]he evidence must establish the lesser-included offense as 'a valid, rational alternative to the charged offense.' " *Id.* (quoting *Forest v. State,* 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)).

In this case, the indictment contained a single paragraph alleging murder (CR 1). Under Penal Code section 19.02(b)(1), the indictment alleges that (1) Appellant intentionally or knowingly caused Mass' death shooting him with a firearm. In comparison, the elements of manslaughter would require some proof that Appellant recklessly caused Mass' death by shooting him with a firearm. *Id.* at § 19.04(a). Conversely, the elements of criminally negligent homicide would require proof that Appellant with criminal negligence caused Mass' death by shooting him with a firearm. *Id.* at § 19.05(a) (West 2003).

In this case, the offense as charged and presented to the jury included intentional or knowing murder under section 19.02(b)(1), which requires a culpable mental state. Tex. Penal Code. Ann. § 19.02(b)(1). "The only distinction between an intentional or knowing murder and the lesser offenses of manslaughter and criminally negligent homicide lies in the culpable mental state accompanying the homicidal act." *Pitonyak v. State,* 253 S.W.3d 834, 846 (Tex. App.-Austin 2008, pet. ref'd). Accordingly, manslaughter, criminally negligent homicide and deadly conduct differ from the charged offense of intentional or knowing murder only in

79

the respect that a less culpable mental state suffices to establish their commission; thus, they are lesser-included offenses of murder as charged and presented to the jury. *See* Tex. Code Crim. Proc. Ann. art. 37.09(3) (West 2006); *see also Pitonyak*, 253 S.W.3d at 846–47; *Pierce v. State*, 234 S.W.3d 265, 269–71 (Tex. App.-Waco 2007, pet. ref'd) (Where indictment charged Pierce with murder under 19.02(b)(1) and (b)(2), the Waco court concluded that manslaughter and criminally negligent homicide were lesser-included offenses of murder as charged in the indictment).

To establish the second prong of the lesser-included offense analysis, Appellant must demonstrate that the evidence at trial raises the issue of manslaughter, criminally negligent homicide and deadly conduct because the jury could have concluded that he did not knowingly or intentionally kill Mass, but either recklessly or negligently caused his death when he fired the fatal shots in his direction. At trial, Appellant's counsel argued that the evidence suggested that Neal fired the shots out of "sudden passion" while he was "stricken with terror" at the events that unfolded before him (RR 17/178). The trial court rejected Appellant's argument (RR 17/182).

Given Appellant's confession that he had no intent to kill Mass at the time the shots were fired, there was proof that the jury could have relied upon to find him guilty of only manslaughter or criminally negligent homicide. Tex. Penal Code Ann. § 6.03(c) (West 2003) (defining "recklessly"); *Id.* at § 6.03(d) (defining "criminal

80

negligence"); *See Guzman,* 188 S.W.3d at 188; *see also Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Crim.App.1975) ("At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk."). As noted supra, at the time he fired the shots, Appellant stated to police that he had no intention of killing Mass (RR 16/241) (Appellant shot Mass 3 times). Appellant maintained in is voluntary statement that the reason he shot Mass was because he feared for his life. *Id.* Anything more than a scintilla of evidence is sufficient to entitle a defendant to an instruction on a lesser-included offense. *See Goad v. State,* 354 S.W.3d 443, 446 (Tex.Crim.App.2011). The evidence can come from any source, and a defendant's testimony alone is sufficient to raise the issue. *Bell v. State,* 693 S.W.2d 434, 442 (Tex. Crim. App. 1985).

Accordingly, because proof existed to justify consideration by the jury of the lesser-included offense instructions for manslaughter, criminally negligent homicide, deadly conduct the trial court erred in denying Appellant's requested special jury instructions. Because the jury was altogether precluded by the trial court from even considering evidence of guilt as to these lesser-included offenses, the error occasion in this case caused sufficient harm and requires reversal. *Wilson v. State,* 391 S.W.3d 131, 138 (Tex. App.–Texarkana 2012, no pet.) (citing *Abdnor,* 871 S.W.2d at 731–32).

## Issue Number 9

The trial court erred in denying Appellant's request for inclusion in the punishment charge of a sudden passion instruction.

## Standard of Review—Jury Instruction Error

We review a trial court's decision whether to instruct the jury on a defensive issue, such as sudden passion, for an abuse of discretion. *See Love v. State,* 199 S.W.3d 447, 455 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd) (*citing Wesbrook v. State,* 29 S.W.3d 103, 122 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 944 (2001)). In reviewing a case involving a sudden-passion jury charge, it is our duty to focus on the evidence supporting that charge, not on the evidence refuting it. *Trevino,* 100 S.W.3d at 239.

During the punishment trial phase of the case, the court inquired whether either the State or defense had any objection to the proposed punishment jury instructions (RR 18/61) (CR 342). Both the State and defense counsel advised the trial court that they had no objection to the punishment charge (RR 18/61). Thereafter, defense counsel filed a motion to replace the current punishment charge (CR 390-91).

In the motion, defense counsel noted "at approximately 5:00 PM on Wednesday, 7 May 2014, the Court excused the jury and ordered same to return to Court on Tuesday, 13 May 2014 to be read the Punishment Charge, to hear

82

closing arguments, and to deliberate the Defendant's punishment in the case at hand" (CR 390). Defense counsel thereafter acknowledged that he made no objection to the trial court's proposed punishment instruction at that time. *Id.* On May 12, 2014, the day prior to the jury's return to court, defense counsel filed his motion requesting replacement of the jury punishment charge. *Id.*

Counsel argued in the motion that the punishment charge should include a section regarding "sudden passion". *Id.* and (RR Sup. 1/6-7). Counsel argued that according to Appellant's confession:

> [H]e felt he had no choice but to shoot Christopher Mass in order to save his own life from immediate imminent attack by Mr. Mass. Mr. Neal explained in his interview that the sudden approach of Mr. Mass and Mr. Neal's immediate fear and apprehension of imminent attack upon him by Mr. Mass, a stranger to Mr. Neal, was the reason he shot Mr. Mass.

(CR 390).

Defense counsel also stressed that:

> During the punishment stage of the trial, the Defendant put on seven witnesses, who, together, inferentially and/or directly painted a picture to the jury that Mr. Neal (1) is not a violent man; (2) is not prone to bursts of temper; (3) is a fluent and gifted communicator who can usually talk his way out of a pending or imminent bad or dire situation. It is therefore possible, under the evidence presented to the jury during the punishment phase of the trial, that Mr. Neal, normally a cool, calm, communicative individual, and while fearing imminent attack from Mr. Mass, acted out sudden passion when he shot and killed Christopher Mass.

*Id.*

83

The State objected to the inclusion of the sudden passion instruction (RR Supp. 1/8). The trial court denied Appellant's requested charge ruling that in order for Appellant to have been entitled to the sudden passion instruction, the evidence had to establish more than "mere fear" (RR Supp. 1/11).

Texas law recognizes that sudden passion and self-defense are distinct inquiries for which a jury's verdict will not always overlap. *See Wooten v. State*, 400 S.W.3d 601, 608–09 (Tex. Crim. App. 2013). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.*; *see also Bell*, 693 S.W. 2d at 442 (noting that such evidence can come from any source, and a defendant's testimony alone is sufficient to raise the issue).

"Sudden passion" is defined for these purposes as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation. *Id.* § 19.02(a)(2). The "adequate cause" giving rise to sudden passion for these purposes is a cause "that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). An accused is entitled to an

84

instruction on every defensive issue raised by the evidence, regardless of whether that evidence is weak, contradicted, un-impeached, or unbelievable. *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). The defendant has the burden of production and persuasion with respect to the issue of sudden passion. TEX. PENAL CODE § 19.02(d).

To justify an instruction on the issue of sudden passion at the punishment phase, at a minimum the record must support inferences that: (1) the defendant acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection; and (4) a causal connection existed "between the provocation, passion, and homicide." *Wooten*, 400 S.W.3d at 605. If the reviewing court agrees that a trial court erred by failing to submit a sudden passion instruction, then it must analyze whether the error harmed the appellant. *Id.* at 606.

In *Wooten*, CCA considered the question whether the defendant had been harmed by the omission of a requested sudden-passion special issue at the punishment phase. *Id.* at 608. In holding that he had not, the CCA

observed that, given that the jury had rejected Wooten's claim that his use of deadly force was justified, it was, on the facts of that record, "highly unlikely" that the jury would have nevertheless found that he acted under the immediate influence of sudden passion. *Id.* at 609. The Court's holding in *Wooten* was based on the rationale that, by its verdict of guilty, the jury had indicated that it "simply did not believe" Wooten's self-defense claim, which was premised on a factual assertion that the complainant had fired upon Wooten first. *Id.* The Court accordingly concluded that Wooten had not suffered "some harm" as a result of the omitted sudden passion special issue. *Id.* at 610.

The facts of this case, however, differ from those in *Wooten*. As noted supra in Issue 4, the trial court completely gutted Appellant's self-defense instruction. As a consequence, the jury in this case, unlike the jury in *Wooten*, was not afforded the opportunity to thoroughly deliberate and determine whether Appellant acted in self-defense. It therefore cannot be presumed that jury in this case would have rejected a sudden-passion special issue.

In *Trevino v. State,* 60 S.W.3d 188 (Tex. App.–Fort Worth 2001), *aff'd* 100 S.W.3d 232 (Tex. Crim. App. 2003), the Fort Worth court of appeals observed that "[w]hen the defendant raises issues of self-defense during the guilt/innocence phase of trial, the issue of sudden passion is typically also

raised…. Accordingly, trial courts should give both instructions when requested." *Trevino*, 60 S.W.3d at 195 (quoting *Chavez v. State*, 6 S.W.3d 66, 72–73 (Tex. App.–San Antonio 1999, pet. ref'd)). Similar language can be found in other cases, albeit in the context of different types of legal challenges. *See, e.g., Chavez*, 6 S.W.3d at 72–73 (ineffective assistance of counsel for failure to request sudden-passion instruction); *Benavides v. State*, 992 S.W.2d 511, 524–25 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd) (legal sufficiency of evidence to support murder conviction). *But see Grffen v. State*, 2014 WL 7474076 (Tex. App.—Houston (1st Dist.) 2014). (observing that "a bare claim of 'fear' " does not demonstrate "sudden passion arising from adequate cause").

As noted supra, Appellant's confession confirms that under the circumstances of his attack he was in fear for his life and had to adequate time to reflect upon the full consequence of his actions. In *McKinney v. State*, No. 12–03–00155–CR, 2004 WL 1852975, 2004 Tex. App. LEXIS 7472 (Tex. App.-Tyler August 18, 2004) this Court noted that for anger or fear to rise to the level of sudden passion, the appellant's mind must have been rendered incapable of cool reflection. In the case *sub judice*, Appellant did not simply act in response to Mass' provocation. He instead acted under the immediate influence of sudden passion arising from an adequate cause, the

fact that two large individuals whom he'd just had a heated verbal exchange with had pursued him outside of the mal in order to fight with him. Accordingly, the facts in this case justified inclusion of a sudden passion instruction in the punishment charge and trial court erred in refusing to grant same.

## **Prayer**

Wherefore, premises considered, appellant prays that the Court reverse the judgment and remand the cause for new trial. Appellant further prays for all other relief to which he may be entitled.

Respectfully submitted,

/s/ Carlo D'Angelo
Carlo D'Angelo
State Bar No. 24052664
100 East Ferguson, Suite 1210
Tyler, Texas 75703
Tel. 903.595.6776
Fax 903.407.4119
carlo@dangelolegal.com
Attorney for the Appellant

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 25,900 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Appellant's brief was delivered via U.S. Mail to the following parties on 26 March 2015:

Michael West
Assistant District Attorney
Smith County District Attorney
100 N. Broadway Avenue, 4th Floor
Tyler, Texas 75702

Jim Ferguson Unit
Inmate: Rickey Neal, Jr.
TDCJ No. 01934438
12120 Savage Dr.
Midway, Texas 75852

/s/ Carlo D'Angelo